21787

STATE of South Carolina *ex relatione* Daniel R. McLEOD, Attorney General of the State of South Carolina, Plaintiff, v. David F. McINNIS, as Chairman and member of the Joint Appropriations Review Committee of the South Carolina General Assembly; Robert C. Lake, Jr., as Vice-Chairman and member of the Joint Appropriations Review Committee of the South Carolina General Assembly; and John Drummond, J. Verne Smith, Nikki G. Setzler, Phil P. Leventis, John C. Lindsay, Tom G. Mangum, T. W. Edwards, Jr., Patrick B. Harris, Charles E. Hodges and John W. Matthews, Jr., as members of the Joint Appropriations Review Committee of the South Carolina General Assembly, Defendants.

(295 S. E. (2d) 633)

*Deputy Atty. Gen., Karen LeCraft Henderson,* Columbia, *for plaintiff.*

*Deputy Atty. Gen., C. Tolbert Goolsby, Jr.,* Columbia, *for defendants.*

August 31, 1982.

*Per Curiam:*

This action, in the original jurisdiction of the Court, was brought by the Attorney General on behalf of the State under the Uniform Declaratory Judgments Act, § 15-53-10, *et seq., Code of Laws of South Carolina* (1976), as amended, to test the constitutionality of Section 18 of Part II, and Sections 131 and 144 of Part I of Act No. 178 of the Acts of 1981 (State Appropriations Bill). This Act provides for the creation of the Joint Appropriation Review Committee (JARC), which is composed of six members of the Senate and six members of the House of Representatives, all of whom are defendants. It is a substantial rewriting of other resolutions and acts dating from 1977. The duties, powers and responsibilities assigned to it will appear from quotations of the sections under attack and printed hereinafter.

It is the basic contention of the Attorney General that the General Assembly has improperly attempted to confer upon JARC authority which is, under the Constitution, allocated to the Executive Department. It is, in essence, the position of the Defendants who form the committee that the powers, duties and responsibilities are "... reasonably incidental to the full

and effective exercise of a legislative power, namely, the appropriation of funds", which is not prohibited by the separation of powers doctrine.

The Defendants submit two questions in their answer, either of which, if decided favorably to them, would end the litigation. First, it is argued that Article IV, § 15 of the Constitution of South Carolina prohibits the bringing of this action by the Attorney General against members of a permanent committee of the General Assembly of South Carolina. Secondly, it is submitted that the Complaint fails to allege the existence of an actual case or controversy ripe for decision. We address these two questions before discussing the separation-of-powers constitutional issue.

I.

Article IV, § 15 of our Constitution prescribes:

The Governor shall take care that the laws be faithfully executed. To this end, the Attorney General shall assist and represent the Governor, *but such power shall not be construed to authorize any action or proceeding against the General Assembly or the Supreme Court.* [Emphasis added.]

We hold that this is not an action or proceeding against the General Assembly. Article III, § 1 provides:

The legislative power of this State shall be vested in two distinct branches, the one to be styled *the "Senate"* and the other *the "House of Representatives,"* and *both together the "General Assembly of the State of South Carolina."* [Emphasis added.]

JARC is not a legislative committee in the ordinary sense. Legislative committees are usually created by rules of the respective houses or by joint rules. No formality is required and, in actuality, committees might be created by simple motion, by House or the General Assembly and is designated a permanent committee. Its members must be Senators and House members. Normally, legislative committees have no final authority and may only report to the authorities which created them. It is significant that JARC has no duty to report to its creator and acts in its own right. It is more like a board or a commission.

We must look not solely to the nomenclature of JARC but also to its structure and powers to determine if its functions are legislative or executive in nature. The mere fact that its members must be members of the House or Senate does not necessarily make of it a legislative committee. The members are not sued as members of the General Assembly but as members of an entity created by statutory law. The right of the members to serve in their capacity as legislators is not contested. It is their right to exercise powers as members of a permanent board created by an act of the General Assembly that is in contest. The authority of the General Assembly or the one-hundred twenty-four House and the forty-six Senate members is not in contest. We hold that the Complaint does not assert a cause of action against the General Assembly and that Article IV, § 15 is inapplicable.

## II.

We next approach the question of whether there is a controversy ripe for decision by this Court. The Attorney General, in his petition to the Court to proceed in the original jurisdiction, asserted that the Complaint he would file "... involves matters that are ... strictly *publici juris* in which no one citizen has any special interest other than that which is common to citizens in general." We have held that where the public interest is involved, the rule requiring the existence of a justiciable controversy is somewhat relaxed. *City of Columbia v. Sanders*, 231 S. C. 61, 97 S. E. (2d) 210 (1957).

The Attorney General has heretofore, without contest, litigated similar issues in this Court using similar proceedings. *State ex rel. McLeod v. Edwards*, 269 S. C. 75, 236 S. E. (2d) 406 (1977), and *State ex rel. McLeod v. Martin*, 274 S. C. 106, 262 S. E. (2d) 404 (1980). While it is true that his right to bring the action was not directly attacked in these cases, the precedents established and our rulings are persuasive for the conclusion that the Attorney General does have a right to bring an action and that a controversy ripe for decision does exist. The Attorney General, by bringing this action in the name of the State, speaks for all of its citizens and may, on their behalf, bring to the Court's attention for adjudication charges that there is an infringement in the separation-of-powers area.

### III.

We now reach the basic issue raised by the Complaint: Does the exercise of powers allocated to JARC as members of the Legislature serving on a committee (board or commission) infringe upon the Executive Department? We think that it does.

Article I, § 8 of the Constitution of South Carolina provides:

§ 8. Separation of powers.

In the government of this State, the legislative, executive, and judicial powers of the government shall be forever separate and distinct from each other, and no person or persons exercising the functions of one of said departments shall assume or discharge the duties of any other.

The separation of powers mandate is followed by Articles III, IV and V, which delineate the authority and functions of the three departments of government. Article III says:

1. The legislative power of this State shall be vested in . . . the "General Assembly of the State of South Carolina."

Article IV states:

1. The supreme executive authority of this state shall be vested in a Chief Magistrate, who shall be styled "The Governor of the State of South Carolina."

Article V specifies:

1. The judicial power shall be vested in a unified judicial system, which shall include a Supreme Court, a Circuit Court, and such other courts of uniform jurisdiction as may be provided for by general law.

One of the prime reasons for separation of powers is the desirability of spreading out the authority for the operation of the government. It prevents the concentration of power in the hands of too few, and provides a system of checks and balances. The legislative department makes the laws; the executive department carries the laws into effect; and the judicial department interprets and declares the laws.

History reveals that there has been much litigation at the national level and at the state level because of conflicts which

have arisen relative to the usurpation of power by one of the three branches of government. There is no forum for the settlement of such disputes other than the courts. The cases are legion upholding and denying constitutionality depending upon the facts. In many instances, a resolution of the dispute is simple. More often, the dispute is in the gray area. This is true because there is tolerated in complex areas of government of necessity from time to time some overlap of authority and some encroachment to a limited degree. *Edwards, supra.* The Budget and Control Board there under attack was composed of five members, two of whom were Chairman of the Ways and Means Committee of the House and of the Senate Finance Committee, respectively. These members did not compose a majority of the board. We held:

> The statutory composition of The Board does not represent an attempt to usurp the functions of the executive department, but apparently represents a cooperative effort by making available to the executive department the special knowledge and expertise of the chairman of the two finance committees in the fiscal affairs of the State and the legislative process in general. We view the ex officio membership of the legislators on The Board as cooperation with the executive in matters which are related to their function as legislators and not usurpation of the functions of the executive department. The Supreme Court of Kansas recently expressed this view in *State ex rel. Schneider v. Bennett,* 219 Kan. 285, 547 P. (2d) 786, 792, as follows:
>
>> The separation of powers doctrine does not in all cases prevent individual members of the legislature from serving on administrative boards or commissioned created by legislative enactments. Individual members of the legislature may serve on administrative boards or commissions where such service falls in the realm of cooperation on the part of the legislature and there is no attempt to usurp functions of the executive department of the government.
>
> The General Assembly has, beyond question, the duty and authority to appropriate money as necessary for the operation of the agencies of government and has

the right to specify the condition under which the appropriated monies shall be spent. This the Assembly traditionally does by way of the annual State Appropriations Bill. In writing the appropriations bill, it attempts as best it can to predict the needs of the various departments of state government. The inspiration for the creation of JARC arose from the fact that the federal government has in recent years, after the appropriations bill had been approved, allocated substantial sums of money by way of revenue sharing, etc. to departments of South Carolina government and local governmental entities. Accordingly, the agencies were receiving and spending not only appropriations which the legislature meant for them to have but, in addition, substantial federal contributions. As a result, the General Assembly was not effectively controlling departmental programs and appropriations.

Typically, a department would spend all that the legislature meant for it to have, plus those amounts it could procure by way of application for grants to the federal government. A report of the Legislative Audit Council in the record shows that various executive agenices were supplementing their state appropriations with millions of dollars in grants of which the General Assembly was not always aware. The effect of all this brought about a result obviously inconsistent with the right and duty of the legislature to determine the appropriations of agencies and the program undertaken.

An agency, by applying for and receiving grants, for all intents and purposes was by indirection, coming to determine programs and policy matters which were the province of the General Assembly. The net effect was that the Assembly was not, in the last analysis, determining the total amount of money expanded by state agencies. JARC, by exercising the powers allocated to it, makes determinations that should be those of the entire General Assembly. This it undertakes to do, not through a legislative process, as it surely could, but through the administration of appropriations which is the function of the executive department. The desirability of the General Assembly's "getting a handle" on these matters is understandable and appropriate but its effort to control these matters through a committee composed of twelve of its members is constitutionally impermissible.

In the Complaint as amended the Attorney General in a first cause of action attacks as being unconstitutional all of

Section 18 of Part II and all of Section 131 and Section 144 of Part I of Act No. 178 of the Acts of the General Assembly for 1981; this is the annual State Appropriations Bill. In a separate cause of action, he attacks all of Section 131 and Section 144 of Part I and the following portions of Section 18 of Part II. In his brief and in argument, he has abandoned his attack on Section 18 as an entity. In addition, the attack on Section 144 is now moot because the section has not been continued in the subsequent appropriation bill for 1982. This leaves in contest for our determination the constitutionality of the following portions of Section 18 and Section 131 as relates to the powers of JARC; our ruling therefore concerns only those sections as copied from the amended Complaint as follows:

> With the exception of appropriations from the general fund and those provided for in Sections 7 through 9 of this act, no agency or institution of state government shall receive and expend any funds without prior approval of the Governor and the concurrence in such approval by the Joint Appropriations Review Committee....
> ... All requests for federal fund allocations shall be furnished to the committee by the Governor with his recommendations. Within a reasonable time, a statement of concurrence or non-concurrence will be furnished by the committee [subsection 4 of Section 18, Act No. 178 of 1981].

> \* \* \* \* \* \*

During the fiscal year for which the funds are authorized, the Governor shall submit to the committee his recommendations for:

> (1) Any changes or proposed changes in federal program structure which would affect state agency programs and budgets;
> (2) Any changes or proposed changes in the funding of such programs including, but not limited to, changes in funding levels, consolidations, distribution and allocation;
> (3) State agency requirements for continuation of programs terminated by federal action.

The committee shall furnish to the Governor, within a reasonable time, a statement of concurrence or nonconcurrence with the recommendations.

\* \* \* \* \* \*

Any allocation, distribution, or consolidation of federal funds between or among any approved recipients or state agencies shall only be authorized by appropriations acts passed by the General Assembly. *Provided*, however, the Governor shall, after review and approval by the committee authorize receipt, reallocation, consolidation, redistribution or transfer of federal funds among or between state agenices [subsection 5 of Section 18, Act No. 178 of 1981].

When reviewing federal grant applications, the Governor shall determine the requirement or desirability for a single state agency designation. If the designation is found to be desirable or required, the Governor, with the concurrence of the committee, shall make the designation [subsection 6 of Section 18, Act No. 178 of 1981].

\* \* \* \* \* \*

The Governor, with prior approval of the Committee, in accordance with the procedure set forth in Sections 4 and 5, may waive the requirement that indirect cost recoveries or overhead cost reimbursements shall be returned to the general funds revenue if it determines it is in the best interests of the State and the agency or institution seeking the grants [subsection 9 of Section 18, Act No. 178 of 1981].

\* \* \* \* \* \*

An annual statewide indirect cost allocation plan shall be prepared by the Governor's office. Each state agency's department's or institution's indirect cost rate proposal shall be prepared by the agency, department or institution and shall be submitted to the Governor and the Joint Review Committee prior to the submission to any federal agency for the agency's approval. After being approved by the Governor and the Committee, the proposal shall be forwarded to the federal agency by the Governor's office and a rate shall be issued to the state agency from the Governor's office [subsection 9A of Section 18, Act No. 178 of 1981].

*   *   *   *   *   *

All Federal Funds received shall be deposited in the State Treasury, if not in conflict with Federal regulations, and withdrawn therefrom as needed, in the same manner as that provided for the disbursement of state funds. If it shall be determined that federal funds are not available for, or cannot be appropriately used in connection with, all or any part of any activity or program for which state funds are specifically appropriated in this Act to match Federal funds, the appropriated funds may not be expended and shall be returned to the General Fund, except upon specific written approval of the Budget and Control Board after review by the Joint Appropriations Review Committee. . . . [Section 131, Act No. 178 of 1981].

From a reading of these sections, the broad authority which the Assembly would confer upon JARC is apparent. The legislature, through these sections, has attempted to delegate to JARC the power to control expenditure of state and federal funds. These sections are constitutionally invalid because they would permit the twelve Defendants to control expenditures by administration rather than by legislation. JARC would have, in effect, a veto power.

We hold that the powers assigned to JARC by the sections quoted hereinabove are executive in nature and are not reasonably incidental to the performance of any legislative duty. The argument that our ruling in *Edwards, supra,* should be controlling is not persuasive; the degree of involvement is different. Each contest involving alleged encroachment of powers must be determined on its own facts.

As indicated above, the relief now sought relates only to those sections quoted herein. We agree that the sections are severable, such that the remaining portions of the act may remain. The effect of our ruling is to leave JARC in tact for such activities as is authorized not inconsistent with the invalidation of the sections under attack.

It is not amiss to point out that a ruling that the work of JARC is legislative would be little comfort. Legislative authority may not be delegated. *Gunter v. Blanton,* 259 S. C. 436, 192 S. E. (2d) 473 (1972).

In summary, we hold that the Attorney General has the right to bring this action against these twelve Defendants in their capacity as committee, board or commission members, and hold that relief by way of a declaratory judgment is proper. We hold that those portions of Section 18 of Part II and that portion of Section 31 of Part I of Act No. 178 of the Acts of the General Assembly for 1981, quoted herein, are unconstitutional because they violate Article I, Section 8, of the Constitution of South Carolina.

GREGORY, J., and JOSEPH R. MOSS, Acting Associate Justice, dissent.

GREGORY, Justice (dissenting):

I respectfully dissent. In my view no justiciable controversy was presented, therefore, I would dismiss this action.

An action brought pursuant to the Uniform Declaratory Judgments Act, South Carolina Code Ann. §§ 15-53-10 through 15-53-140 (1976) must involve an actual, justiciable controversy. *South Carolina Electric & Gas Company v. South Carolina Public Service Authority,* 215 S. C. 193, 54 S. E. (2d) 777 (1949). "A justiciable controversy is a real and substantial controversy which is ripe and appropriate for judicial determination, as distinguished from this dispute of a contingent, hypothetical or abstract character. *Notios Corp. v. Hanvey,* 256 S. C. 275, 182 S. E. (2d) 55 (1971)." *Orr v. Clyburn,* S. C. 290 S. E. (2d) 804, 807 (1982).

Here, the Attorney General is asking this Court to decide a constitutional question regarding certain legislation in advance of any real need to do so. Nowhere in his complaint is there an allegation of fact which indicates any problem presently associated with the implementation of this legislation.

> While it has been held that the declaratory judgment statute should be liberally construed to accomplish its intended purpose of affording a speedy and inexpensive method of deciding legal disputes and of settling legal rights and relationships without awaiting a violation of the rights or a disturbance of the relationships, *Williams Furniture Corporation v. Southern Coatings & Chemical Co.,* 216 S. C. 1, 56 S. E. (2d) 576, it is uniformly held that the Declaratory Judgments Act does not require the

Court to give a purely advisory opinion as to the issues sought to be raised. *City of Columbia v. Sanders,* 231 S. C. 61, 97 S. E. (2d) 210.

*Powers v. McNair,* 255 S. C. 150, 177 S. E. (2d) 551, 553 (1970).

Upon review of the record, briefs, and arguments of counsel, I find no justiciable controversy between the parties. Thus, I would dismiss this action as it seeks merely an advisory opinion. *Biter v. South Carolina Employment Security Commission,* 276 S. C. 493, 280 S. E. (2d) 60 (1981); *Booth v. Grissom,* 265 S. C. 190, 217 S. E. (2d) 223 (1975); *O'Shields v. McLeod,* 257 S. C. 477, 186 S. E. (2d) 408 (1972). The Declaratory Judgments Act is not properly invoked for an advisory opinion for later use by the Attorney General if the Executive Branch or the Legislative Branch reach the occasion which might demand it. *Orr v. Clyburn, supra.*

I would dismiss.

JOSEPH R. MOSS, Acting Associate Justice, concurs.