925 So.2d 174 (2005)
Hugh McINNISH
v.
Bob RILEY, as Governor of the State of Alabama, et al.
1040436.
Supreme Court of Alabama.
September 30, 2005.
*175 Mark G. Montiel, Montgomery, for the appellant.
Troy King, atty. gen., and Kevin C. Newsom, deputy atty. gen., and Charles B. Campbell, asst. atty. gen., for appellees Bob Riley and Kay Ivey; and Mose W. *176 Stuart IV, asst. atty. gen., Department of Finance-Legal Division, for appellees James Allen Main and Robert L. Childree.
Joe Espy III and J. Flynn Mozingo of Melton, Espy & Williams, P.C., Montgomery, for appellee the Joint Fiscal Committee.
WOODALL, Justice.
Hugh McInnish appeals from a judgment of the Montgomery Circuit Court upholding the constitutionality of statutes he challenged as a taxpayer in this declaratory-judgment action. We reverse and remand.
This dispute involves the validity of "community services grants" disbursed pursuant to Act No. 98-677, Ala. Acts 1998, codified at Ala.Code 1975, §§ 29-2-120 to -124, and portions of Act No. 2004-456, the education appropriations act, for the fiscal year ending September 30, 2005, which appropriated $11.7 million for the disbursements. Section 29-2-121 creates a "permanent Joint Legislative Oversight Committee on Community Services Grants" ("the Committee"). The voting members of the Committee consist of eight members of the legislature, including "the Chair of the House Ways and Means Committee; the Chair of the Senate Finance and Taxation-Education Committee; [and] the Chair of the Senate Committee on Economic Expansion and Trade" (hereinafter collectively "the Chairs"). Id. The five remaining legislators are appointed to the Committee by the Chairs. Specifically, pursuant to § 29-2-121, the Chair of the House Ways and Means Committee appoints three members from the House Ways and Means Committee, the Chair of the Senate Finance and Taxation-Education Committee appoints one member from the Senate Finance and Taxation-Education Committee, and the Chair of the Senate Committee on Economic Expansion and Trade appoints one member of the Senate Committee on Economic Expansion and Trade. Finally, the "State Superintendent of Education and [the] State Finance Director [serve on the Committee] in advisory capacities." § 29-2-121 (emphasis added).
The duties of the Committee are set forth in § 29-2-123:
"It shall be the duty of the committee to review applications and approve any community services grants made from any funds appropriated to the committee by the Legislature for the purpose of awarding community services grants. The committee may become a grantmaking agency and receive and distribute any appropriations made by the Legislature to the committee for the community services grant program pursuant to Chapter 24 of Title 41. The committee shall evaluate grant proposals based on the relevance of such proposals to the purposes for which such grants shall be made; the extent to which such grant proposal advances the program objectives of the grant-making agency; the ability of the grant recipient to fulfill the objectives of the grant proposal; and the extent to which the grant proposal can benefit the greatest number of citizens, without excluding any geographic regions of the state. All of the above information may be ascertained by appropriate measures, which shall include interviews, audits, public hearings, and recommendations by members of the Legislature. It shall also be the duty of the committee to ensure that, of any appropriations received by the committee, a minimum of the equivalent of 0.4% of such appropriations shall be distributed to each House district and 1.2% of such appropriations shall be distributed to each Senate district."
(Emphasis added.)
On May 26, 2004, McInnish sued (1) Bob Riley, Governor of the State of Alabama, *177 (2) Drayton Nabers,[1] then director of finance, (3) Robert L. Childree, comptroller, and (4) Kay Ivey, state treasurer, in their official capacities. The complaint sought a judgment declaring that Ala.Code 1975, § 29-2-123, and Act No. 2004-456 insofar as it appropriates moneys to fund the community-services grants violate the separation-of-powers provisions of the Constitution of Alabama. More specifically, the complaint averred that "[t]he granting or awarding of funds appropriated under Act 2004-456 for expenditure by a committee of the legislature, as set forth in Ala.Code § 29-2-123, constitutes encroachment of the executive powers specifically reserved to the executive branch of government by the Alabama Constitution." (Emphasis added.) It further sought an injunction preventing the distribution of any funds pursuant to § 29-2-123. On July 23, 2004, the Joint Fiscal Committee of the legislature[2] filed a "motion to intervene," which the trial court granted.
Following an evidentiary hearing on September 28, 2004, the trial court entered an order containing the following pertinent factual findings:
"Act 2004-456 (the Education Budget) was passed by the Alabama Legislature and became law on May 14, 2004. The Act makes a line-item appropriation of $11,700,000 to the Joint Legislative Oversight Committee for the award of community service[s] grants for educational purposes. Such appropriation constitutes one-quarter (1/4) of one percent (1%), or .0025 of the entire education budget. The Act, including the line-item appropriation, was approved by . . . Governor Riley and became immediately effective upon his signature.
". . . .
"As required by § 29-2-123, a minimum equal percentage of any appropriation to the Committee is reserved for community service[s] grants in each House and Senate district in the State of Alabama. Such community service[s] grants, however, are only awarded where an appropriation is made to the Committee. For example, in the 2003-2004 fiscal year, the Committee did not function because it did not receive an appropriation.
"The Committee operates by reviewing and approving or rejecting applications for community service[s] grants submitted by legislators for educational needs in their districts. Applications that are not for educational purposes are rejected. The Committee receives and solicits input and feedback from both applicants and potential grantees in reviewing grant applications.
"According to the undisputed testimony, it is within an individual legislator's discretion to apply for a community service[s] grant, or even to apply at all. However, any application for a grant must be for an educational purpose, as required by the appropriation to the Committee. Consequently, using their discretion, some legislators apply for grants to the boards of education in *178 their district. Other legislators, on the other hand, apply for the individual needs of teachers and school administrators in their district.
"All applications are reviewed by the Committee, which conducts open hearings for review and comment on the applications. The applications are also open records available for review at any time by the public.
"The grants are paid by the State Comptroller, a member of the Executive Branch, who issues a check made payable to the grantee. In turn, the legislator who applied for the grant may deliver the check to the grantee or the check will be mailed directly to the grantee."
(Emphasis in original.)
The trial court rejected McInnish's constitutional challenge and entered a judgment for the defendants. McInnish appealed, contending that "the trial court erred in refusing to declare that Ala.Code § 29-2-123 and [portions of] Act [No.] 2004-456 are unconstitutional." McInnish's brief, at 10. The attorney general filed a brief on behalf of Governor Riley and State Treasurer Ivey (hereinafter referred to as "the executive-branch defendants"). No separate brief was filed on behalf of the finance director and the comptroller.
The facts are undisputed, and the standard of review of the trial court's judgment as to the constitutionality of legislation is well established. This Court "`should be very reluctant to hold any act unconstitutional.'" Ex parte D.W., 835 So.2d 186, 189 (Ala.2002) (quoting Ex parte Boyd, 796 So.2d 1092, 1094 (Ala.2001)). "[I]n passing upon the constitutionality of a legislative act, the courts uniformly approach the question with every presumption and intendment in favor of its validity, and seek to sustain rather than strike down the enactment of a coordinate branch of the government." Alabama State Fed'n of Labor v. McAdory, 246 Ala. 1, 9, 18 So.2d 810, 815 (1944) (emphasis added). This is so, because "it is the recognized duty of the court to sustain the act unless it is clear beyond reasonable doubt that it is violative of the fundamental law." 246 Ala. at 9, 18 So.2d at 815 (emphasis added). Guided by these principles, we consider whether the legislature, in authorizing the spending of appropriated funds by a legislative committee created for that purpose, has usurped the role of the executive branch in violation of the principle of separation of powers.
"Some . . . state Constitutions expressly provide in one form or another that the legislative, executive, and judicial powers of the government shall be forever separate and distinct from each other. Other Constitutions, including that of the United States, do not contain such an express provision. But it is implicit in all, as a conclusion logically following from the separation of the several departments." Springer v. Philippine Islands, 277 U.S. 189, 201, 48 S.Ct. 480, 72 L.Ed. 845 (1928). (emphasis added). The Constitution of Alabama is of the former sort, that is, it "expressly adopts the doctrine of separation of powers that is only implicit in the Constitution of the United States." Birmingham-Jefferson Civic Ctr. Auth. v. City of Birmingham, 912 So.2d 204, 212 (Ala.2005).
The doctrine is enshrined in Ala. Const. 1901, §§ 42 and 43, which provide:
"[§ 42] The powers of the government of the State of Alabama shall be divided into three distinct departments, each of which shall be confided to a separate body of magistracy, to wit: Those which are legislative, to one; those which are executive, to another; and those which are judicial, to another."

*179 "[§ 43] In the government of this state, except in the instances in this Constitution hereinafter expressly directed or permitted, the legislative department shall never exercise the executive and judicial powers, or either of them; the executive shall never exercise the legislative and judicial powers, or either of them; the judicial shall never exercise the legislative and executive powers, or either of them; to the end that it may be a government of laws and not of men."[3]
In that connection, the Alabama Constitution declares that "[t]he legislative power of this state shall be vested in a legislature, which shall consist of a senate and a house of representatives." Ala. Const. 1901, § 44 (emphasis added). "The supreme executive power of this state shall be vested in a chief magistrate, who shall be styled `The Governor of the State of Alabama.'" Ala. Const.1901, § 113 (emphasis added). It is the governor whom the people have charged to "take care that the laws be faithfully executed." Ala. Const.1901, § 120 (emphasis added). "[T]he core power of the legislative branch" is, therefore, the making of laws, while "the core power of the executive branch" is the enforcement of those laws. Opinion of the Justices No. 380, 892 So.2d 332, 335 (Ala.2004).
Acknowledging these concepts, McInnish concedes that the legislature's appropriation power is plenary. See also Morgan County Comm'n v. Powell, 292 Ala. 300, 306, 293 So.2d 830, 834 (1974) ("The authority to determine the amount of appropriations necessary for the performance of the essential functions of government is vested fully and exclusively in the legislature."); 63C Am.Jur.2d Public Funds § 34 (1997) ("The power to appropriate public funds for specific purposes and to reduce appropriations is solely a legislative power."). He contends, however, that "[o]nce a legislative body appropriates funds, its role ends and it is for the executive branch to make the discretionary decisions as to how appropriated funds shall be expended." McInnish's brief, at 13 (emphasis added). He argues, in effect, that the separation-of-powers doctrine forbids the legislature from executing the laws it enacts, and that that is precisely what the challenged statutory scheme purports to allow.
For that proposition, McInnish cites Bowsher v. Synar, 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986), which involved a constitutional challenge to the "Balanced Budget and Emergency Deficit Control Act of 1985, Pub.L. 99-177, 99 Stat. 1038, 2 U.S.C. § 901 et seq. (1982 ed., Supp. III), popularly known as the `Gramm-Rudman-Hollings Act.'" 478 U.S. at 717, 106 S.Ct. 3181. Simply stated, the Gramm-Rudman-Hollings Act provided for "`automatic' reductions" in the federal budget to be implemented by the comptroller general, 478 U.S. at 718, 106 S.Ct. 3181, who was "an officer of the Legislative Branch." 478 U.S. at 731, 106 S.Ct. 3181. The Court held that "[b]y placing the responsibility for execution of the [Gramm-Rudman-Hollings Act] in the hands of an officer who is subject to removal *180 only by itself, Congress in effect [had] retained control over the execution of the Act" in violation of the principle of separation of powers. 478 U.S. at 734, 106 S.Ct. 3181.
In so holding, the Court stated:

"[T]he Constitution does not permit Congress to execute the laws; it follows that Congress cannot grant to an officer under its control what it does not possess.

". . . .
"To permit an officer controlled by Congress to execute the laws would be, in essence, to permit a congressional veto."
478 U.S. at 726 (emphasis added). The Court explained:
"Appellants suggest that the duties assigned to the Comptroller General in the [Gramm-Rudman-Hollings] Act are essentially ministerial and mechanical so that their performance does not constitute 'execution of the law' in a meaningful sense. On the contrary, we view these functions as plainly entailing execution of the law in constitutional terms. Interpreting a law enacted by Congress to implement the legislative mandate is the very essence of `execution' of the law. Under § 251 [of the Act], the Comptroller General must exercise judgment concerning facts that affect the application of the Act. He must also interpret the provisions of the Act to determine precisely what budgetary calculations are required. Decisions of that kind are typically made by officers charged with executing a statute.
"The executive nature of the Comptroller General's functions under the Act is revealed in § 252(a)(3) which gives the Comptroller General the ultimate authority to determine the budget cuts to be made. Indeed, the Comptroller General commands the President himself to carry out, without the slightest variation... the directive of the Comptroller General as to the budget reductions. . . .
"Congress of course initially determined the content of the [Gramm-Rudman-Hollings Act]; and undoubtedly the content of the Act determines the nature of the executive duty. However, as [INS v. Chadha, 462 U.S. 919 (1983),] makes clear, once Congress makes its choice in enacting legislation, its participation ends. Congress can thereafter control the execution of its enactment only indirectly  by passing new legislation."
478 U.S. at 732-34, 106 S.Ct. 3181 (emphasis added).
Applying Bowsher to this case, McInnish argues:
"The Supreme Court explained that `once Congress makes its choice in enacting legislation, its participation ends.' 478 U.S. at 734. In this case, the legislature, in Act 2004-456 [and § 20-2-123], has placed in the hands of a legislative committee the responsibility of executing the appropriation of $11.7 million for Community Service[s] Grants. However, the legislature's appropriation of $11.7 million for the purpose of Community Service[s] Grants is the end of the legislative function. The executive function  the decision-making regarding the distribution of those funds to various schools or projects  then begins. The legislature can thereafter control the execution of its enactment only by passing new legislation."
McInnish's brief, at 16 (emphasis added). Remarkably, neither the executive-branch defendants nor the Joint Fiscal Committee discuss, or even acknowledge, Bowsher.
Perhaps more to the point of this case than Bowsher is Stockman v. Leddy, 55 Colo. 24, 129 P. 220 (1912), overruled on other grounds, Denver Ass'n for Retarded *181 Children, Inc. v. School Dist. No. 1, 188 Colo. 310, 535 P.2d 200 (1975). The state legislation challenged in that case "create[d] a joint legislative committee, `consisting of three members of the Senate and three members of the House of Representatives,' the appointment of whom [was] to be `by the respective presiding officers thereof.'" 55 Colo. at 25, 129 P. at 221. In a subsequent case the United States Supreme Court described the role of the joint committee as being "to investigate the rights of [Colorado] in the flowing waters therein. The committee was authorized to determine what steps were necessary to be taken to protect the rights of the state, to employ counsel, etc." Springer v. Philippine Islands, 277 U.S. at 203, 48 S.Ct. 480 (discussing Stockman). The Attorney General of Colorado was an ex officio member of the committee and was charged with the "supervision of all actions or proceedings directed by said committee to be brought in behalf of the state." 55 Colo. at 26, 129 P. at 221. The Colorado Legislature had appropriated $50,000, "`which said fund [was to] be subject to the use and disposal of said committee, and the Auditor of State [was to] draw warrants therefor upon vouchers approved by said committee and signed by the chairman and secretary thereof.'" 55 Colo. at 26, 129 P. at 221.
The Colorado Supreme Court held that the legislation violated the separation-of-powers provisions of the Colorado Constitution. In so holding, it stated:
"It will be observed that there is no pretense by the [legislature] that the investigation which it authorizes, and the ascertainment of facts which it proposes, are to aid it in future legislation, or to assist it in its legislative capacity in supplying a remedy for some existing evil, or to furnish such information as a guide to the Attorney General, or some other appropriate officer of the executive department, in the performance of his duties in carrying out the legislative mandate. There can be no question that it is competent for the [legislature] to authorize such an investigation to be made by its own members for such purposes and to appropriate money to defray the necessary expenses thereof. But that is not the case we are considering. The [legislature], it is true, purported to make an appropriation; but that appropriation is for the purpose of conducting an investigation by a committee of its own members, so that the committee itself might reach a conclusion as to what action it should deem proper to take to protect existing property rights of the state. In other words, the [legislature] not only passed an act  that is, made a law  but it made a joint committee of the Senate and the House as its executive agent to carry out that law. This is a clear and conspicuous instance of an attempt by the [legislature] to confer executive power upon a collection of its own members. This is contrary to article 3 of our Constitution, which reads: `The powers of the government of this state are divided into three distinct departments  the legislative, executive and judicial  and no person, or collection of persons, charged with the exercise of powers properly belonging to one of these departments shall exercise any power properly belonging to either of the others except as in this Constitution expressly directed or permitted.' It is, of course, in the affairs of government, not always easy to distinguish between executive, legislative, and judicial power, and it sometimes happens that power properly belonging to one department is exercised by another department, but properly, and only, as an incident to its own legitimate functions. The attempt *182 here, however, undisguised, is to confer purely executive power upon a collection of members of the legislative department.

". . . The [legislature] might well have authorized the Attorney General to expend this money in protecting the rights of the state here involved, and, if it had done so, and the act in other respects had been within the constitutional limit, no question could have been successfully raised as to its validity.
"The legislative committee was without power to control this appropriation, and the Auditor of the state was right in refusing to recognize its claim to the possession thereof."
55 Colo. at 30-32, 129 P. at 223 (emphasis added).
Indeed, the Joint Fiscal Committee concedes  as it must  that the "exercise [of] discretion in determining when and how to distribute funds" is an "executive" function. Brief of Joint Fiscal Committee, at 19 (emphasis added). It is well established that "handing out public money is a classically executive function." Frank H. Easterbrook, "Success" and the Judicial Power, 65 Ind. L.J. 277, 281 (1990). Bowsher itself is cited for the principle that "the spending of appropriated money [is] an executive function." Note, Timing Isn't Everything: the Supreme Court Decides That a Presidential Cancellation Does Indeed "Walk, Swim, and Quack" Like a Line-item Veto, 29 Seton Hall L.Rev. 1618, 1667 (1999) (emphasis added).
More recently, the Justices of this Court acknowledged this principle in concluding that the separation-of-powers provisions of the Alabama Constitution do not "permit either the House or the Senate, through action or inaction, effectively to veto a contract entered into by the executive branch." Opinion of the Justices No. 380, 892 So.2d at 337. There, the principle was noted in the following cases:
"`Alexander et al. v. State, 441 So.2d 1329, 1341 (Miss.1983) ("Once taxes have been levied and appropriation made, the legislative prerogative ends and executive responsibility begins. . . ."); State ex rel. McLeod, Atty. Gen. v. McInn[i]s et al., 278 S.C. 307, 317, 295 S.E.2d 633, 637 (1982) ("[A]dministration of appropriations. . . is the function of the executive department."); Anderson v. Lamm, 195 Colo. 437, 447, 579 P.2d 620, 627 (1978) ("[T]he requirement for Joint Budget Committee approval unconstitutionally infringes upon the executive's power to administer appropriated funds."); In re Opinion of the Justices to the Senate, [375 Mass. 827,] 376 N.E.2d 1217, 1222 (Mass.1978) ("[T]he activity of spending money is essentially an executive task."); State ex rel. Schneider v. Bennett, 219 Kan. 285, 301, 547 P.2d 786, 797 (1976) (State Finance Council overseeing use of budget appropriations held to be an unconstitutional encroachment on powers of the executive); In re Opinion of the Justices to the Governor, 369 Mass. 990, 341 N.E.2d 254, 257 (1976) ("[T]o entrust the executive power of expenditure to legislative officers is to violate [the mandated separation of powers] by authorizing the legislative department to exercise executive power."); State ex rel. Meyer v. State Board, 185 Neb. 490, 500, 176 N.W.2d 920, 926 (1970) ("[The legislature] cannot through the power of appropriation exercise or invade the constitutional rights and powers of the executive branch of the government. It cannot administer the appropriation once it has been made."); People v. Tremaine, 252 N.Y. 27, 56, 168 N.E. 817, 827 (1929) (Crane, J., concurring) (holding unconstitutional a requirement that a legislative committee sit with the governor in decisions *183 regarding spending of money on state buildings (see separate opinion of Justice Crane)).'"
892 So.2d at 338-39 n. 6 (opinion of six Justices), 892 So.2d at 341 (opinion of two Justices) (quoting Opinion of the Justices No. 87-314, 129 N.H. 714, 718-19, 532 A.2d 195, 197-98 (1987)). "`Once the legislature has made an appropriation for the executive branch, the requirement of fiscal committee approval of contracts made pursuant thereto by the executive branch is an unconstitutional intrusion into the executive branch of government.'" 892 So.2d at 338, quoting Opinion No. 87-314, 129 N.H. at 718, 532 A.2d at 197.
The executive-branch defendants and the Joint Fiscal Committee seek support, however, in Opinion of the Justices No. 64, 244 Ala. 386, 13 So.2d 674 (1943). For example, the Joint Fiscal Committee states that "[t]he Justices of this Honorable Court have previously opined that § 42 and § 43 of the Constitution of Alabama do not prohibit legislators from serving on legislatively created boards or agencies which spend appropriations." Joint Fiscal Committee's brief, at 12-13. However, these defendants overlook crucial distinctions between the cases.
In that advisory opinion, the legislature had requested advice as to the likely[4] constitutionality of an act pending before the legislature to establish "a War Emergency Council and the appropriation of the surplus over and above $750,000.00 in the State Treasury to the credit of the General Fund to a War Emergency Fund created by said Act." 244 Ala. at 387, 13 So.2d at 675. The purpose of the Council was to "allocate[] . . . funds appropriated to [it] for . . . supplementing the appropriation made by the Legislature to any department, institution, or agency of the State, or [for] meeting any emergency . . . in any department . . . for which State funds are authorized to be expended." 244 Ala. at 388, 13 So.2d at 676.
The Council was to be composed of "eight members of the Legislature of Alabama. Four of the legislative members [were to] be elected from the Senate and four from the House of Representatives." 244 Ala. at 388, 13 So.2d at 675. However, the Council also included the governor, who was to serve as the chairman. Id. Meetings of the Council were to be at the call of the governor. At such meetings, any member of the Council was authorized to propose "an allocation of any part of the funds appropriated to the Council." 244 Ala. at 388, 13 So.2d at 676. However, "[i]n the event the Governor disapprove[d] any proposal made by a member of the Council, no part of the fund appropriated [could] be allocated." 244 Ala. at 388, 13 So.2d at 676. Thus, the governor ultimately controlled all disbursements through the veto power.
Six Justices concluded that the proposed act would not violate § 43 of the Alabama Constitution. They reasoned that the Council constituted a "State agency," and that "[w]hen the members of the Legislature [were] selected to serve . . ., they [did] so as members of a board, not as members of the Legislature." 244 Ala. at 390, 13 So.2d at 677. "They are not," the Justices stated, "ex officio members because they are also chairmen of certain legislative committees." Id.
*184 The executive-branch defendants and the Joint Fiscal Committee apparently see no material distinctions between the operations of the Council in that case and the Committee in this one. If so, they are mistaken. The Joint Fiscal Committee argues: "As with the War Emergency Council, the members of the [Committee] are not acting as legislators, but are performing wholly ministerial acts, and nothing more and nothing less." Joint Fiscal Committee's brief, at 14. We disagree.
There is nothing "ministerial" about the operations of the Committee. An act is "`ministerial, when the law, exacting its discharge, prescribes and defines the time, mode and occasion of its performance, with such certainty that nothing remains for judgment or discretion.'" Patterson v. Gladwin Corp., 835 So.2d 137, 151 (Ala. 2002) (quoting Grider v. Tally, 77 Ala. 422, 425 (1884)) (emphasis added in Patterson). "`Official action, the result of performing a certain and specific duty arising from fixed and designated facts, is a ministerial act.'" Id.
In this case, the legislature merely appropriated to the Committee $11.7 million to be disbursed at the discretion of the Committee. The Committee's discretion was unbridled, except in two respects. First, as stated by the trial court, use of the money is restricted to "educational purposes." Second, "minimum equal percentage[s]" are earmarked for "each House and Senate district in the State of Alabama." More specifically, approximately $120,000 was appropriated for each senate district, and approximately $40,000 was appropriated for each house district.
As the trial court found, "it is within an individual legislator's discretion to apply for a community service[s] grant, or even to apply at all." (Emphasis added.) In response to applications, "[t]he Committee receives and solicits input and feedback from both applicants and potential grantees," and "conducts open hearings for review and comment on the applications."
The extent of the Committee's discretion was illustrated by Senator Wendell Mitchell, a member of the Committee, during the following colloquy at trial:
"[Senator Mitchell]: [The Committee meets] regularly to consider applications from members [of the legislature]. Each member as has been pointed out, gets `X' amount of dollars and they fill out this form that's prescribed. We review the forms. We discuss the forms. We either approve, deny, or modify. And once a form is approved, a check request is made and the legislator gets the money to spend for that particular purpose.
"[The Court]: Is there any provision whereby the Committee can call house and senate members who make application before the Committee for further [clarification] on the application?
"[Senator Mitchell]: Yes, indeed, Judge. In fact, we have had several members come and we wanted to hear their personal statement, their personal testimony as to what the intent of this grant was. We've done that several times.
"[The Court]: So it's not just submitting an application and a rubber stamp?

"[Senator Mitchell]: Oh, absolutely not. No, sir. We turn down some. We modify some. We send some back for further clarification if we're not satisfied with the clarification. We ask the member to come personally; appear before the Committee."
(Emphasis added.)
Disbursements of the $11.7 million appropriated under the challenged legislation are not, therefore, ministerial acts. Indeed, if the Committee is not the source of *185 administrative discretion, then we are at a loss as to the identity of that source. Clearly, the source is not the executive branch. That branch's only role in this process is ministerial: the issuance of checks by the comptroller upon the demand of the Committee. Unlike the council in Opinion of the Justices No. 64, which operated under the direct authority of the governor, the Committee operates entirely outside the control of the executive branch. Although two executive-branch officials, namely, the state superintendent of education and the state finance director, sit on the Committee, they serve only in "advisory capacities." Thus, not only does the executive branch have no veto power as it did in Opinion of the Justices No. 64, it does not even have a vote on the Committee. See State ex rel. Schneider v. Bennett, 219 Kan. 285, 296, 547 P.2d 786, 796 (1976) (upholding, against a separation-of-powers challenge, the power of a "state finance council," which consisted of the governor and eight legislators, to "authorize expenditures . . . from the state emergency fund in the event of extraordinary emergency conditions," because the actions of the council were subject to veto by the governor, who chaired the council). The only avenue available to the Governor under this statutory scheme is his line-item veto of appropriations bills, pursuant to Ala. Const.1901, § 126, while the legislature is in session. See Hunt v. Hubbert, 588 So.2d 848 (Ala.1991).
Moreover, the Joint Fiscal Committee's contention that "members of the [Committee] are not acting as legislators" simply ignores reality. In Opinion of the Justices No. 64, the Justices noted that the legislative members of the council did not serve ex officio as "chairmen of certain legislative committees." 244 Ala. at 390, 13 So.2d at 677. In this case, however, at least three of the Committee members do serve ex officio, in their roles as chairs of the legislative committees designated in § 29-2-121. Likewise, the services of the other members are tied to their memberships on "certain legislative committees."
That the Committee regards itself as an arm of the legislature is clearly illustrated by the following testimony of Senator Mitchell:
"Q. [By McInnish's counsel]: Does the body of the legislature or the state senate or the state house ever act upon those grant applications?
"A. [Senator Mitchell]: We are the senate, so the answer is `yes' to that.
"Q. That is my question. Does the full senate take any action on those grant applications?
". . . .
"A. No."
(Emphasis added.) It is clear, therefore, that the name, "Joint Legislative Oversight Committee on Community Services Grants," is not a misnomer but in fact accurately reflects that the Committee is an arm of the legislature, and not an organ of the executive branch.
The executive-branch defendants contend that, "in approving community service[s] grants, the activities of the [Committee] are, at most, merely administrative, not executive." Executive-branch defendants' brief, at 24. This contention is without merit.
The word "administrative" is synonymous with the word "executive." The word administrative "[c]onnotes of or pertains to administration, especially management, as by managing or conducting, directing, or superintending, the execution, application or conduct of persons or things." Black's Law Dictionary 45 (6th ed.1990) (emphasis added).[5] Thus, "[a]dministrative *186 acts" are "[t]hose acts which are necessary to be done to carry out legislative policies and purposes already declared by the legislative body." Id. (emphasis added). In fact, it is common to use the two words in tandem. See, e.g., Point Props., Inc. v. Anderson, 584 So.2d 1332, 1338 (Ala.1991) ("Although absolute immunity from § 1983 actions is available to government officials performing legislative functions at the municipal level, generally only qualified or `good faith' immunity has been extended to government officials performing discretionary functions that are characteristically executive or administrative." (emphasis added)); Roberts v. Baldwin County Comm'n, 733 So.2d 406, 408 (Ala.Civ.App.1998) ("`the actual exercise of [the power to prevent] the destruction of a public roadway is in the nature of an executive or administrative function'") (quoting Point Props., Inc., 584 So.2d at 1337-38) (emphasis added); Tischer v. Housing & Redevelopment Auth. of Cambridge, 693 N.W.2d 426, 429 (Minn.2005) ("Separation of powers requires that [discretionary decisions of an executive body] be granted deference by the judiciary to avoid usurpation of the executive body's administrative prerogatives." (emphasis added)).
The executive-branch defendants and the Joint Fiscal Committee also make much of the fact that Governor Riley actually opposes McInnish's constitutional challenge. For example, according to the Joint Fiscal Committee, Governor Riley's opposition is evidence that the Committee "was not intended to `invoke any usurpation of . . . powers or prerogatives . . . of the executive department' and is not viewed or considered by the executive branch as a usurpation of its powers." Joint Fiscal Committee's brief, at 30.
However, "[a]n executive or administrative officer can no more abdicate responsibility for executing the laws than the Legislature can be permitted to usurp it." California Radioactive Materials Mgmt. Forum v. Department of Health Servs., 15 Cal.App.4th 841, 874, 19 Cal.Rptr.2d 357 (1993), disapproved on other grounds, Carmel Valley Fire Prot. Dist. v. California, 25 Cal.4th 287, 305, fn. 5, 105 Cal.Rptr.2d 636, 20 P.3d 533 (2001). See Clinton v. City of New York, 524 U.S. 417, 452, 118 S.Ct. 2091, 141 L.Ed.2d 393 (1998) ("That a. . . cession of power is voluntary does not make it innocuous. . . . Abdication of responsibility is not part of the constitutional design.") (Kennedy, J., concurring); New York v. United States, 505 U.S. 144, 182, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992) ("The Constitution's division of power among the three branches is violated where one branch invades the territory of another, whether or not the encroached-upon branch approves the encroachment."); State ex rel. Crenshaw v. Joseph, 175 Ala. 579, 610, 57 So. 942, 952 (1911) (McClellan, J., dissenting) ("Under our organic law, to the executive is apportioned an important part in the performance of the legislative function. And it is entirely plain from the Constitution that the executive cannot delegate his part in the legislative process to anyone; for it is to the judgment of the person lawfully exercising the authority of the executive that the Constitution commits so much of the legislative function as it imposes upon the executive."). Thus, because the Constitution prohibits the abrogation of core executive powers as well as their usurpation, the Governor's actual opinion on this issue is not dispositive. "It is the province and duty of the judicial branch of government to interpret the constitution and to say what the law is. . . ." Opinion of the Justices *187 No. 338, 624 So.2d 107, 110 (Ala.1993) (emphasis added).
In that connection, the executive-branch defendants and the Joint Fiscal Committee contend that the issue in this case is "a non-justiciable political question as defined by this Court's recent opinion in [Birmingham-Jefferson Civic Center Authority v. City of Birmingham, 912 So.2d 204 (Ala.2005),]" and, therefore, that its resolution is beyond the reach of this Court. Joint Fiscal Committee's brief, at 31-32. We disagree.
The issue presented in Birmingham-Jefferson Civic Center was "whether the rules and procedure by which the Alabama House of Representatives determine[s] that . . . bills . . . [have] receive[d] a majority vote . . . are subject to judicial review." 912 So.2d at 217 (emphasis added). This Court held that they were not. 912 So.2d at 217. In doing so, we explained:
"Section 53, Ala. Const.1901, specifically commits to each house of the legislature the `power to determine the rules of its own proceedings.' Our Constitution contains no identifiable textual limitation on the legislature's authority with respect to voting procedures that would permit judicial review of those procedures. There is also a lack of judicially discoverable and manageable standards for resolving whether the House of Representatives constitutionally passed [an act]. Finally, for the judicial branch to [review] the legislature's procedure for determining that a bill has passed would be to express a lack of the respect due that coordinate branch of government."
912 So.2d at 221 (emphasis added).
"The `political question' doctrine is grounded primarily in the separation of powers." Fletcher v. Kentucky, 163 S.W.3d 852, 860 (Ky.2005). "Under this doctrine, the judicial department should not interfere in the exercise by another department of a discretion that is committed by a textually demonstrable provision of the Constitution to the other department,. . . or seek to resolve an issue for which it lacks judicially discoverable and manageable standards." Id. (emphasis added). Thus, "`[w]here a claim "concerns not a want of . . . power, but a mere excess or abuse of discretion in exerting a power given, it is clear that it involves considerations which are beyond the reach of judicial power."'" Utah Ass'n of Counties v. Bush, 316 F.Supp.2d 1172, 1185-86 (D.Utah 2004) (emphasis added) (quoting Dalton v. Specter, 511 U.S. 462, 474, 114 S.Ct. 1719, 128 L.Ed.2d 497 (1994), quoting in turn Dakota Central Tel. Co. v. South Dakota ex rel. Payne, 250 U.S. 163, 184, 39 S.Ct. 507, 63 L.Ed. 910 (1919)). "`"This must be since . . . the judicial may not invade the legislative or executive departments so as to correct alleged mistakes or wrongs arising from asserted abuse of discretion."'" Id.
However, if the question is not one of discretion but of power, the separation-of-powers doctrine is no bar to judicial review. In other words, where the issue is whether "`the [legislative branch has] exceeded the limits of [its] authority, thereby acting unlawfully, the courts will not hesitate to say so.'" PACE, Suburban Bus Div. of Reg'l Transp. Auth. v. Regional Transp. Auth., 346 Ill.App.3d 125, 136, 803 N.E.2d 13, 23, 280 Ill.Dec. 783, 793 (2003) (emphasis added) (quoting West Side Org. Health Servs. Corp. v. Thompson, 73 Ill. App.3d 179, 187, 391 N.E.2d 392, 399, 29 Ill.Dec. 129, 136 (1979), rev'd on other grounds, 79 Ill.2d 503, 404 N.E.2d 208, 38 Ill.Dec. 784 (1980)). See Doe v. Bush, 323 F.3d 133, 141 (1st Cir.2003) (citing cases in which the United States Supreme Court resolved questions "concerning the distribution of constitutional authority between *188 the legislative and executive branches, notwithstanding the call for restraint embodied in the political question doctrine"). Indeed, it is beyond cavil that in considering whether "a legislative act is repugnant to the Constitution, the courts not only have the power, but it is their duty, when the issue is properly presented, to declare it so." Peddycoart v. City of Birmingham, 354 So.2d 808, 811 (1978); see Opinion of the Justices No. 380, 892 So.2d 332 (Ala. 2004); Ex parte Jenkins, 723 So.2d 649 (Ala.1998); Hawkins v. James, 411 So.2d 115 (Ala.1982); Broadway v. State, 257 Ala. 414, 60 So.2d 701 (1952).
In this case, we are not concerned with internal legislative matters of parliamentary procedure, but with a question concerning the fundamental power of the legislature to enact a law of statewide application. The political-question doctrine is no bar, therefore, to judicial resolution of the issue presented.
In conclusion, we hold that § 29-2-123, which authorizes a permanent joint legislative committee to award community-services grants, and so much of Act No. 2004-456 by which those grants are funded "constitute," in the words of the complaint, an "encroachment of the executive powers specifically reserved to the executive branch of government by the Alabama Constitution." The legislature cannot, consistent with § 42 and § 43, execute the laws it enacts. See Bowsher v. Synar, 478 U.S. at 726, 106 S.Ct. 3181; Stockman v. Leddy, 55 Colo. at 31, 129 P. at 223. Thus, the legislature may not create a committee of its own members to spend appropriations at the committee's discretion without at least such executive-branch control as was contemplated in Opinion of the Justices No. 64, 244 Ala. 386, 13 So.2d 674 (1943).
Yet that is precisely what § 29-2-123 purports to authorize. It authorizes members of the Committee to sit as senators and representatives, deciding whether to approve or deny grant requests made by fellow legislators. The Committee convenes hearings and receives evidence. It then exercises discretion and "judgment concerning facts that affect the application of the [statute]. . . . Decisions of [this] kind are typically made by officers charged with executing a statute." Bowsher, 478 U.S. at 733, 106 S.Ct. 3181. Once it renders its decision, the Committee orders the comptroller, an executive-branch official, to perform the ministerial task of issuing checks to the recipients of the grants in the specified amounts.
"`[W]here the whole power of one department is exercised by the same hands which possess the whole power of another department, the fundamental principles of a free constitution, are subverted.'" Mistretta v. United States, 488 U.S. 361, 381, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989) (quoting The Federalist No. 47, at 325-26 (James Madison) (J. Cooke ed.1961) (emphasis in The Federalist)). Because the grant-making process created by § 29-2-123 begins and ends in the legislature, it violates the separation-of-powers provisions of the Constitution of Alabama.
For these reasons, the trial court erred in entering a judgment upholding § 29-2-123 and the appropriations in Act No. 2004-456 for the community-services grants against McInnish's constitutional challenge. That judgment is, therefore, reversed, and the case is remanded for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
HARWOOD, STUART, SMITH, BOLIN, and PARKER, JJ., concur.
*189 LYONS, J., concurs in part and concurs in the result.
NABERS, C.J., recuses himself.
LYONS, Justice (concurring in part and concurring in the result).
I concur fully in all aspects of the main opinion except that portion discussing this Court's holding in Birmingham-Jefferson Civic Center Authority v. City of Birmingham, 912 So.2d 204 (Ala.2005), a case in which I recused myself and as to which I express no opinion.
NOTES
[1] Drayton Nabers was subsequently appointed Chief Justice of this Court, and James Allen Main was appointed director of finance and was substituted as a defendant in this action, pursuant to Rule 25(d)(1), Ala. R. Civ. P.
[2] The Joint Fiscal Committee is a "continuing legislative committee," created to "supervise the operation of the Legislative Fiscal Office." Ala.Code 1975, § 29-5-2. By Act No. 91-606, Ala. Acts 1991, a senate joint resolution, the legislature expressly authorized the Joint Fiscal Committee "to defend against, intervene in or initiate legal proceedings on behalf of" that committee in actions challenging "appropriation acts passed by the Legislature and budgeting processes."
[3] These provisions "transform" into "fundamental law" the "maxim" of the eighteenth-century French political philosopher Montesquieu: "`All would be lost if the same man or the same body of principal men, either of nobles, or of the people, exercised [the] three [governmental] powers: that of making the laws, that of executing public resolutions, and that of judging the crimes or the disputes of individuals.'" Ex parte Jenkins, 723 So.2d 649, 654 (Ala.1998) (quoting Montesquieu, The Spirit of the Laws 157 (Cohler et al. trans., Cambridge Univ. Press 1989)).
[4] Reliance on advisory opinions must always be tempered with caution in that "[a]n advisory opinion is an opinion of the individual Justices signing the opinion; [it] is not issued by the Alabama Supreme Court acting in its judicial capacity and, therefore, is not binding precedent." Opinion of the Justices No. 382, 907 So.2d 1022, 1025 (Ala.2005). See also Opinion of the Justices No. 381, 892 So.2d 375 (Ala.2004).
[5] The definition of "administrative" was not carried forward with the seventh or eighth edition of Black's Law Dictionary.