602 S.E.2d 39

**BRACKENBROOK NORTH CHARLESTON, LP, North Bluff North Charleston, LP, Riverwoods, LLC, Ashley Arbor, LLC, et al., Respondents/Appellants,**

v.

**The COUNTY OF CHARLESTON, Andrew Smith in his official capacity as Charleston County Treasurer, Peggy A. Moseley in her official capacity as Charleston County Auditor, and D. Michael Huggins in his official capacity as Charleston County Assessor, Appellants/Respondents.**

No. 25855.

Supreme Court of South Carolina.

Heard April 20, 2004.

Decided Aug. 16, 2004.

Rehearing Denied Sept. 27, 2004.

Joseph Dawson, III, and Bernard Ferrara, Jr., both of Charleston County Attorney's Office, of North Charleston; M. Dawes Cooke, Jr., and P. Gunnar Nistad, both of Barnwell,

Whaley, Patterson & Helms, L.L.C., of Charleston, for Appellants/Respondents.

G. Trenholm Walker, Andrew K. Epting, and Amanda R. Maybank, all of Pratt–Thomas, Epting & Walker, P.A., of Charleston, for Respondents/Appellants.

Justice PLEICONES:

Respondents/appellants (Taxpayers) filed this action against appellants/respondents (County)[1] seeking a refund of a portion of their 2001 real property taxes. The parties appeal orders which, among other things, held that Taxpayers were not required to exhaust their administrative remedies prior to bringing this refund action directly in circuit court. We hold this ruling was error, and reverse and remand the matter to circuit court with instructions to dismiss the suit without prejudice to Taxpayers' rights to pursue refunds through administrative channels.

## FACTS

A countywide appraisal resulted in large increases in the assessed value of many real properties located in County. In May 2000, the General Assembly passed an act (Enabling Act) authorizing counties to exempt from *ad valorem* property taxes any increase in valuation greater than 15%. *See* S.C.Code Ann. § 12–37–223A (Supp.2003). In November 2000, County adopted Ordinance 1163 (Ordinance), purportedly pursuant to the Enabling Act. The Ordinance capped the valuation increase on owner-occupied primary residences at 15%, but provided no relief for other properties.[2]

The "property tax assessment" (PTA) for each parcel of taxable real estate in a county is determined by multiplying the property's fair market value or special use value by the

---

1. Appellants/Respondents in this appeal are the County and three county officials: the treasurer, the auditor, and the assessor. We will refer to them collectively as "County" in this opinion.

2. Property classified as owner-occupied primary residences is taxed on an assessment equal to four percent of the fair market value of the property. S.C.Code Ann. § 12–43–220(C)(1) (Supp.2003). All other real property not specifically classified under section 12–43–220 is taxed at six percent.

appropriate assessment ratio, that is, 4% for owner-occupied residences and 6% for other properties. S.C.Code Ann. § 12–60–30(19) (2000 and Supp. 2003). This PTA figure is then multiplied by the taxing district's[3] millage rate, resulting in the tax assessment, that is, the dollar amount owed by the taxpayer for that year.[4] The millage is determined by dividing the value of all taxable property located within a taxing district's boundaries by the district's annual budget.[5]

The effect of the Ordinance in tax year 2001 was to reduce the fair market value of many owner-occupied residences. As the result of the Ordinance's reduction of the total value of taxable real property in the County, the millage rate for all taxing districts was higher than it would have been had all property been fully valued. All County taxpayers in 2001 were affected by the higher millage although taxpayers who benefited from the Ordinance's cap ultimately received a tax bill for an amount less than they would have received had the cap not been imposed. The impact of the Ordinance in tax year 2001 was to shift approximately $9.83 million of the tax burden primarily to owners of non-owner-occupied primary residences.

Following the adoption of the Ordinance, but prior to the date 2001 property taxes were due, certain county taxpayers (*Riverwoods* plaintiffs) brought an action challenging the legality of the Ordinance. The *Riverwoods* plaintiffs sought a declaratory judgment striking down the Ordinance and also sought an injunction. The trial judge found the Ordinance invalid, but declined "to issue injunctive relief of any sort that

---

3. Different property within the County is subject to different taxing entities depending on the property's location within, for example, a municipality, and/or a special purpose district.

4. County has adopted a Local Options Sales Tax (LOST). *See* S.C.Code Ann §§ 4–10–10 through –90 (Supp.2003). Pursuant to the LOST act, each year a credit factor is determined for each taxing district within the County; each parcel's individual credit is determined by multiplying the property's fair market or special use value by the taxing entity's credit factor. The resulting credit is then subtracted from the tax assessment figure, resulting in the actual tax owed by the property owner.

5. *See also County of Lee v. Stevens*, 277 S.C. 421, 289 S.E.2d 155 (1982) (explanation of *ad valorem* real property tax system).

would constitute affirmative judicial interference with the County's taxing processes ... Whether the County chooses on its own to take any remedial action in light of this Court's decision is up to it." *Riverwoods* circuit court order.

County appealed the *Riverwoods* order to the extent it struck down the Ordinance, and the *Riverwoods* plaintiffs cross-appealed the denial of injunctive relief. On appeal, the Court held the Ordinance invalid because it violated the terms of the Enabling Act which did not permit the 15% cap to be limited to owner-occupied primary residences. *Riverwoods, LLC v. County of Charleston,* 349 S.C. 378, 563 S.E.2d 651 (2002). In affirming the *Riverwoods* plaintiffs' appeal from the denial of the injunction, we held that they had an adequate legal remedy in that they could pay their 2001 *ad valorem* property taxes "under protest"[6] and cited S.C.Code Ann. § 12–60–2550 (2000).[7]

After the circuit court filed its order in *Riverwoods* striking down the Ordinance, five taxpayers paid their 2001 real property taxes "under protest" and virtually simultaneously filed a civil action seeking a declaratory judgment that the Ordinance was invalid and seeking a refund. This suit, and ensuing cross-appeals, is resolved by our opinion in the companion case to the present controversy. *See Hoefer Family Ltd. Partnership v. County of Charleston,* Op. No. 25856, 360 S.C. 403, 602 S.E.2d 47, 2004 WL 1822988 (August 16, 2004).

The Taxpayers in this case timely paid their 2001 real property taxes; following our decision in *Riverwoods* declaring the Ordinance invalid, they initiated this circuit court action seeking certification of a taxpayer class and refunds for all class members. The circuit court certified a class and ordered refunds; in so doing, it refused County's request that the action be dismissed in order for Taxpayers to exhaust their administrative remedies. Both Taxpayers and County

6. Reference to "paying under protest" is an anachronism; under the current tax scheme in Title 12, Chapter 60, there is no requirement that an *ad valorem* taxpayer pay "under protest" in order to pursue a refund.

7. We incorrectly suggested that the *Riverwoods* plaintiffs could seek prepayment relief under § 12–60–2550, a statute concerned only with PTA protests.

have appealed numerous issues. We find it necessary to address only the issue whether Taxpayers were required to exhaust their administrative remedies rather than bring this direct refund suit in circuit court.

## ISSUE

Was the circuit court obligated to dismiss this suit for a refund because Taxpayers had failed to exhaust their administrative remedies?

## ANALYSIS

■ In 1995 the General Assembly adopted the South Carolina Revenue Procedures Act[8] (the Act) "to provide the people of this State with a straight forward procedure to determine any disputed revenue liability." S.C.Code Ann. § 12–60–20 (2000).[9] Section 12–60–80 (Supp.2003) of the Act provides:[10]

**§ 12–60–80. Wrongful collection of taxes; declaratory judgment; class action prohibited.**

(A) Except as provided in subsection (B), **there is no remedy other than those provided in this chapter in any case involving the illegal or wrongful collection of taxes,** or attempt to collect taxes.

---

8. 1995 Act No. 60.

9. In 2000, the General Assembly substituted the phrase "dispute with the Department of Revenue" for "any disputed liability" in § 12–60–20. *See* § 12–60–20 (Supp.2003). Although this amendment could be read as indicative of an intent to limit the Act to tax issues involving the DOR, when amending § 12–60–20 the legislature did not amend or repeal those parts of the Act which deal solely with county tax disputes. In light of this, we hold that a court must look first to the Act when faced with a question of county tax protest procedures. *Glover v. Suitt Constr. Co.*, 318 S.C. 465, 458 S.E.2d 535 (1995) (statutes which are part of the same general law are construed together).

10. This statute was amended effective June 18, 2003, prior to the final order in this matter. Before that date, § 12–60–80 read:
    There is no remedy other than those provided in this chapter in any case involving the illegal or wrongful collection of taxes, or attempt to collect taxes.
    The amendment does not affect our resolution of the administrative remedies issue.

(emphasis supplied).

(B) Notwithstanding subsection (A), an action for a declaratory judgment where the sole issue is whether a statute is constitutional may be brought in circuit court. This exception does not include a claim that the statute is unconstitutional as applied to a person or a limited class or classes of persons.

(C) Notwithstanding subsections (A) and (B), a claim or action for the refund of taxes may not be brought as a class action in the Administrative Law Judge Division or any court of law in this State, and the department, political subdivisions, or their instrumentalities may not be named or made a defendant in any other class action brought in this State.

If a taxpayer brings a circuit court action when she should have pursued administrative remedies under the Act, the circuit court "shall dismiss the case without prejudice." § 12–60–3390 (2000 and Supp. 2003). County contends the circuit court erred in refusing to dismiss Taxpayers' direct refund suit without prejudice under this statute since Taxpayers were required to first pursue administrative remedies under the Act. We agree.

The circuit court reviewed our decision in *Riverwoods, supra*, which indicated that the remedy for taxpayers aggrieved by the Ordinance was found in § 12–60–2550. The circuit court held that Taxpayers were not obligated to pursue this administrative remedy since their objection did not challenge their Property Tax Assessment (PTA), which is the only type of property tax protest contemplated by this statute. The circuit court went on to hold that Taxpayers had no remedy under the Act because the court concluded that the Act did not provide a procedure for any type of challenge other than to the PTA. As explained below, we agree that § 12–60–2550 is not applicable to these Taxpayers, but conclude the circuit court erred in concluding they had no administrative remedy under the Act.

The Act contains detailed procedures for a taxpayer who wishes to challenge the county's determination of her property's PTA, that is, the fair market value, the special use value, or the assessment ratio, the components of the PTA. § 12–60–

30(19). Under the statutory scheme, most PTA appeals are initiated and resolved well before the taxes are due. The procedures found in article 9 of the Act apply to all PTA appeals. § 12–60–1710 (2000). In years where there has been a countywide reassessment, notice of the new valuations must be mailed to property owners by February 1.[11] § 12–60–2510 (2000 and Supp. 2003). In other years, the assessor must give notice by July 1 to owners whose property values have been increased by $1,000 or more. *Id.* The property owner has 30[12] days to give the assessor written notice if she objects to one or more of the PTA components. § 12–60–2510(3). A written request for a meeting with the assessor is the equivalent of notice that the taxpayer objects to the PTA. § 12–60–2520(A). If, after reviewing the written objection, the assessor agrees with the property owner, the assessor must correct the error. § 12–60–2520(B). If she does not agree, then she must schedule a meeting. If the issue is not resolved at the meeting, then the assessor must give the taxpayer protest information. *Id.* On this protest form, the taxpayer must identify which part of the PTA she disagrees with, that is the property's value or its classification, and propose her suggested value or class. § 12–60–2520(B)(5). The assessor must respond to the protest within 30 days, and give the taxpayer notice that she must pursue any appeal before the county board of assessment appeals. § 12–60–2520(B)(4).

The county board of assessment appeals(board) "may rule on any timely appeal relating to the correctness of any of the elements of the [PTA]...." § 12–60–2530. After the board's written disposition of an appeal, the aggrieved party (whether taxpayer or assessor) may appeal to the Administrative Law Judge Division. § 12–60–2540. If the PTA appeal will not be concluded by December 31 of the tax year, the assessor must ask the auditor to issue an adjusted property tax bill figured on 80% of the protested assessment. § 12–60–2550.

These statutes contemplate that a PTA protest will be initiated prior to the payment of any tax, and anticipates that most PTA protests will be resolved before the taxes are due.

---

11. Beginning in 2002, this date has been changed to October 1.2002 Act No. 271, § 1.

12. Now 90.

In situations where the PTA appeal will not be concluded by December 31, § 12–60–2550 provides for the issuance of a reduced bill and mandates a refund if the appeal results in a decision that the Taxpayer owes an amount less than the 80% already paid. § 12–60–2550(C).

There may be situations where the PTA protest is initiated so close to the tax due date that it is not possible for the auditor to issue an adjusted bill as provided by § 12–60–2550. In those rare situations the taxpayer will be required to pay the bill in full, and her remedy will be to initiate an administrative refund action pursuant to § 12–60–2560.[13]

While the Act contains many specific procedures for taxpayers challenging their PTAs, relief under the Act is not limited to these types of protests. Section 12–60–2530(A) specifically provides the board of assessment appeals may rule on any PTA dispute "and also other relevant claims of a legal or factual nature except claims relating to property tax exemptions." Although no prepayment procedure is specified for non-PTA protests, the Act does provide for a taxpayer to seek a refund of taxes paid. § 12–60–2560 (2000). The first part of this refund statute provides that a person seeking a refund because of an alleged PTA error must comply with the specific limitations found in § 12–60–1750, which in turn refers to the time limitations initiating PTA appeals. § 12–60–2560(A). Subsection (A) of the refund statute requires persons seeking administrative refunds for reasons other than PTA errors to commence those actions within the time limits of § 12–54–85(F), which is essentially a two-year statute of limitations. If § 12–60–2560 were limited to PTA refunds, as the circuit court found here, then there would be no reason for it to refer to § 12–54–85(F) since the time limits for commencing all related actions would be the 90 day PTA limit found in § 12–60–2510(3).

As with PTA protests, a taxpayer commences a refund action by filing a claim with the assessor. § 12–60–2560(A). In refund actions, however, the assessor together with the auditor and treasurer make the initial determination. If the

---

**13.** *See also* S.C.Code Ann. § 12–43–220(C)(3) (2000) (permitting refund action under § 12–60–2560 notwithstanding any other provision of law where property was eligible for a 4% classification).

refund request is denied, the taxpayer may appeal to the county board of assessment appeals. The refund statute contains a specific reference to the board's authority to rule on a timely PTA appeal, just as the PTA appellate statute specifically refers to the board's ability to rule on timely PTA appeals as well as "other relevant claims of a legal or factual nature ..." *Compare* § 12–60–2560(B) *with* § 12–60–2530(B). The refund statute then defaults to the procedures followed by the board in a PTA appeal under § 12–60–2530. § 12–20–2560(B–D) (2000).

A taxpayer disputing a PTA must timely initiate his claim. A timely PTA claim will, in almost all instances, be made before any tax is due: if not resolved prior to that due date, then a taxpayer may invoke the 80% payment procedure found in § 12–60–2550. In those unusual circumstances where a PTA protest is not commenced prior to the tax due date, and in all other circumstances where a taxpayer believes that he has been wrongly or illegally required to pay a property tax, then the taxpayer must first pay the tax and then initiate a request for a refund pursuant to § 12–60–2560.

■ These Taxpayers do not dispute any component of their PTA. Rather, Taxpayers complain that their PTA was subjected to a higher millage, and thus their tax bills were inflated, as the consequence of the application of the unlawful Ordinance. Looking first to the Act, as we must,[14] we hold that Taxpayers' remedy is not this direct circuit court refund suit, but rather an administrative refund pursuant to § 12–60–2560. In fact, Taxpayers acknowledged at oral argument that they had initiated an administrative refund action, which has been stayed pending disposition of this appeal. Since Taxpayers had this administrative refund remedy available to them, the circuit court erred in refusing to dismiss this action without prejudice. § 12–60–3390. Accordingly, we reverse the circuit court orders and remand this matter with instructions to dismiss the suit without prejudice to Taxpayers' rights to pursue their refund requests.

■ We are deeply concerned that other taxpayers within

14. *See* § 12–60–20 and § 12–60–80.

the class certified by the circuit court judge [15] in this case may have forgone their administrative remedies in reliance on the orders issued in this case. For this reason, and because County concedes, as it must, that it is required to return the unlawfully collected taxes, we instruct that all taxpayers within the class who have not yet filed administrative refund actions shall have 120 days after the remittitur is sent to file such claims. Notice of this right shall be given to all eligible taxpayers, in writing, by County within thirty days of the filing of this opinion.

Further, we express our disapproval of County's actions in all matters related to this Ordinance. County chose, in the face of a court order striking down the Ordinance and a blunt warning by the trial judge that it was proceeding at its own risk, to collect taxes pursuant to that Ordinance. Once the Ordinance's invalidity was confirmed by this Court, County chose not to refund the illegally collected taxes promptly, but chose instead to place obstacles in the way of its wronged taxpayers. County did not promptly pay refunds to taxpayers who initiated a court action, nor, the record shows, did it pay those taxpayers who pursued administrative remedies. Instead of minimizing the fiscal impact of its unwise decision to levy taxes in reliance on the Ordinance, County has expended more taxpayer money fighting the refund-seekers on every front.

Further, in an unprecedented act, County audaciously suggested to the trial judge, and now suggests to us, that the judicial system issue a writ of mandamus to County requiring it to rebill all County taxpayers who benefited in 2001 from the unlawful Ordinance. It is axiomatic that mandamus, "the highest judicial writ known to the law," [16] lies only to compel the performance of a ministerial act and "is limited ... to the protection of a plain, admitted, and unquestioned legal right that has been arbitrarily or without due warrant of

---

**15.** "All real property taxpayers whom Charleston County billed for 2001 *ad valorem* real property taxes and who owned at least one parcel of real property subject to *ad valorem* taxes that did not qualify for the value exemption under the tax cap Ordinance."

**16.** *Willimon v. City of Greenville*, 243 S.C. 82, 86, 132 S.E.2d 169, 170 (1963).

law denied." *Gardner v. Blackwell,* 167 S.C. 313, 320, 166 S.E. 338, 340 (1932). Were the duty so clear that issuance of this prerogative writ was warranted, then County would not need our imprimatur in order to act.[17]

## CONCLUSION

The circuit court orders are reversed and the case remanded with instructions to the circuit court to dismiss the suit without prejudice pursuant to § 12–60–3390. Further, County shall, within thirty days of this opinion, give written notice to all taxpayers within the class certified by the circuit court, other than those who have already initiated administrative refund requests, of their right to seek an administrative refund, and of the date by which the refund request must be initiated. Finally, pursuant to Rule 222(a), SCACR, we award Taxpayers their appellate costs, and a reasonable attorney's fee. Accordingly, the orders on appeal are

REVERSED AND REMANDED.

BURNETT, J., and Acting Justice J. ERNEST KINARD, Jr., concur.

MOORE, Acting C.J., dissenting in a separate opinion in which WALLER, J., concurs.

Acting Chief Justice MOORE, dissenting:

The majority's decision requires Taxpayers to pursue administrative remedies by filing claims for refunds with the county assessor under § 12–60–2560. I respectfully dissent.[18]

---

**17.** In 1903, we held that assessments for back taxes could be made only "in pursuance of express and very specific statutory direction." *Milster v. City of Spartanburg,* 68 S.C. 26, 32, 46 S.E. 539, 541 (1903). We have been unable to locate statutory authority for a rebill of selected taxpayers, nor have we been able to discern a ministerial duty on the part of County to rebill certain taxpayers. *Compare* S.C.Code Ann. § 12–4–510(3) (2000); *see also* S.C.Code Ann. § 12–60–1740 (2000) (if funds are not available for refunds, the county government must provide for repayment).

**18.** I agree we incorrectly instructed the *Riverwoods* plaintiffs to apply for administrative relief under § 12–60–2550.

As the majority points out, Taxpayers' claims do not involve property tax assessments but instead challenge the proper millage rate to be applied in calculating the amount of tax due. The county assessor has no authority regarding millage rates and relief under § 12–60–2560 is inappropriate. *See* S.C.Code Ann. § 12–37–90 (2000) (responsibilities and duties of assessors); *see also County of Lee v. Stevens*, 277 S.C. 421, 289 S.E.2d 155 (1982) (the authority to set the tax rate belongs to the county governing body).

Further, Chapter 60, Subarticle 9, including § 12–60–2560, applies only to complaints regarding county property tax assessments. Section 12–60–2560 provides in pertinent part:

(A) Subject to the limitations in Section 12–60–1750, and within the time limitation of Section 12–54–85(F), a property taxpayer may seek a refund of real property taxes assessed by the county assessor and paid ... by filing a claim for refund with the county assessor....

The majority concludes the reference to the statute of limitation found in § 12–54–85(F) indicates that § 12–60–2560 must allow appeals aside from property tax assessments since property tax assessments are already governed by the time lines set out in § 12–60–2510. I disagree. Refund claims under § 12–60–2560 are governed by the general statute of limitation in § 12–54–85(F) because § 12–60–2560 allows challenges to the assessment ratio for prior years. Other sections of the tax code specify that § 12–60–2560 is the remedy in this assessment context. *See* S.C.Code Ann. § 12–43–220(c)(3) (2000) (allowing application under § **12–60–2560** for refund because the property was eligible for the legal residence assessment ratio); *see also* S.C.Code Ann. § 12–37–252(B) (2000) ("When a person qualifies for a refund pursuant to Sections **12–60–2560** and 12–43–220(c) for prior years' eligibility for the four percent owner-occupied residential assessment ratio, the person also may be certified for a homestead tax exemption...."). This limited reading of § 12–60–2560 is consistent with the remaining sections of Subarticle 9 which all relate to county property tax assessments.

In sum, Chapter 60 does not include contests to a county's tax rate and the limitation in § 12–60–80 to the remedies provided in this chapter does not control. I therefore agree

with the circuit court's ruling that the administrative process is limited to challenges to an individual's property tax assessment and does not apply here.

Further, the majority's decision allows those who benefited from the illegal ordinance to retain a windfall. Since County has represented to this Court that it is willing to issue recalculated tax bills to all taxpayers for the 2001 tax year, I would order it to do so. This is a fair resolution to ensure that all taxpayers equitably share the tax burden for services provided in 2001. If County simply pays refunds, the amount refunded must be included as a liability in a future budget. It is unfair that Taxpayers would then be taxed to cover the cost of their own refunds.

I would affirm.

WALLER, J., concurs.