678 S.E.2d 412

Casey EDWARDS and Justin Williams, Petitioners,

v.

STATE of South Carolina and Mark Sanford, in his Official Capacity as Governor of the State of South Carolina, Respondents.

and

South Carolina Association of School Administrators, Petitioner,

v.

The Honorable Mark Sanford, in his official capacity as the Governor of the State of South Carolina, and The Honorable Jim Rex, in his official capacity as the State Superintendent of Education of South Carolina, Respondents.

No. 26662.

Supreme Court of South Carolina.

Heard June 3, 2009.

Decided June 4, 2009.

84

Richard A. Harpootlian and Graham L. Newman, of Richard A. Harpootlian, PA, of Columbia, for Petitioners Edwards and Williams.

Kenneth L. Childs, William F. Halligan, John M. Reagle, and Keith R. Powell, of Childs & Halligan, P.A.; and Frank S. Holleman, III, of Wyche Burgess Freeman & Parham, PA of Greenville, for Petitioner South Carolina Association of School Administrators.

Attorney General Henry D. McMaster, Deputy Attorney General Robert D. Cook, Assistant Deputy Attorney General J. Emory Smith, Jr., and Senior Assistant Attorney General C. Havird Jones, Jr., of Columbia, for Respondent State of South Carolina.

John W. Foster, of Kilpatrick Stockton, LLP, of Columbia; Adam H. Charnes, Richard D. Dietz, and William R. Poplin, Jr., of Kilpatrick Stockton, LLP, of Winston–Salem, NC, for Respondent Sanford.

Shelly Bezanson Kelly, Karla McLawhorn Hawkins, Barbara A. Drayton, and Wendy Bergfeldt Cartledge, of South Carolina Department of Education, of Columbia, for Respondent Rex.

Richard Mark Gergel and W. Allen Nickles, III, of Gergel, Nichols & Solomon, of Columbia, for amicus curiae South Carolina Education Association.

Chief Justice TOAL, Justice WALLER, Justice BEATTY, and Justice KITTREDGE:

 We accepted these matters concerning the application for State Fiscal Stabilization (SFS) funds under the American Recovery and Reinvestment Act of 2009 (ARRA)[1] in our original jurisdiction. These two cases are brought as the result of a dispute between the Governor of South Carolina and the General Assembly of South Carolina over whether the State should apply for and accept the SFS portion of the ARRA funds. This Court has no role to play in the policy considerations at issue between the Governor and the General Assembly. Our duty under the South Carolina Constitution and the remand from the United States District Court for the District of South Carolina is to declare the law. Petitioners in the first action (Edwards Action) seek a declaratory judgment

---

1. The American Recovery and Reinvestment Act of 2009, Pub.L. 111–5 (2009).

that § 1607 of the ARRA allows the South Carolina General Assembly to request, accept, and distribute the SFS funds, which the General Assembly included in the 2009–10 General Appropriations Bill (the Budget), and that Governor Sanford must execute the Budget as enacted by the General Assembly.

In the second action (SCASA Action), Petitioner seeks a declaration of the rights, status, and other legal relations between the parties concerning Part III of the Budget; to declare Respondents must take the actions required by Part III of the Budget; and to order equitable relief to cause Respondents to perform the duties under Part III of the Budget. In addition, Petitioner asks the Court to issue a writ of mandamus to compel Governor Sanford to perform the duties required under Part III of the Budget. Finally, Petitioner asks for a declaratory judgment that the State Superintendant of Education has been empowered by the General Assembly to act in the Governor's name to apply for the SFS funds.

## I.

## FACTUAL/PROCEDURAL BACKGROUND

The ARRA, federal economic stimulus legislation, was enacted by Congress to preserve and create jobs and promote economic recovery; assist those most impacted by the recession; provide investments needed to increase economic efficiency by spurring technological advances in science and health; invest in transportation, environmental protection, and other infrastructure that will provide long-term economic benefits; and stabilize state and local government budgets in order to minimize and avoid reductions in essential services and counterproductive state and local tax increases. ARRA, § 3(a). In the ARRA, as is typical in federal funding legislation, Congress specifies how the federal funds are to be allocated and spent in the respective states.

Section 1607(a) of the ARRA requires the Governor, within forty-five days of the enactment of the ARRA, to certify that: (1) the State will request and use funds provided by the Act; and (2) the funds will be used to create jobs and promote economic development. Because Governor Sanford disap-

proved of the use of funds as mandated by Congress, he initially indicated he would not make the § 1607(a) certification. Yet on the final day for certification, April 3, 2009, Governor Sanford made the § 1607(a) certification by letter to the Director of the Office of Management and Budget, including the request "that funds be released to the appropriate state agencies to spend in accordance with guidelines set forth in the ARRA and by federal agencies." In his April 3, 2009 certification letter, Governor Sanford did express "reservations" and noted his intention to pursue his concerns with the "policy makers within the General Assembly of South Carolina."

The South Carolina General Assembly acted on Governor Sanford's § 1607(a) certification. On May 13, 2009, the General Assembly appropriated the ARRA funds, including the SFS funds, in the Budget[2]. In Proviso 90.15 of Part IB of the Budget, the General Assembly set forth its intention to "accept all available funds from the State Budget Stabilization Fund contained within the American Recovery and Reinvestment Act of 2009 and to authorize expenditure of such funds as delineated in this act."

In Part III, Section 1 of the Budget, the General Assembly requires the Governor and the State Superintendent of Education to take all actions necessary and required by the ARRA and the U.S. Secretary of Education in order to secure the receipt of the funds recognized and authorized for appropriation in the Budget. In accordance with the ARRA guidelines, Part III of the Budget requires the Governor to apply for the phase one State Fiscal Stabilization funds within five days of the effective date of Part III. The Governor is required to apply for the phase two funds within thirty days of those funds becoming available.

In addition, on May 14, 2009, pursuant to § 1607(b) of the ARRA, in an apparent response to Governor Sanford's public criticism of the ARRA, the General Assembly adopted a concurrent resolution[3] to accept the ARRA funds should the Governor fail to accept the funds. Section 1607(b) provides:

2. H. 3560, 118th Gen. Assem., Reg. Sess. (S.C. 2009).

3. S. 577, 118th Gen. Assem., Reg. Sess. (S.C. 2009).

"If funds provided to any State in any division of this Act are not accepted for use by the Governor, then acceptance by the State legislature, by means of the adoption of a concurrent resolution, shall be sufficient to provide funding to such State." Pursuant to § 1607(c), entitled "DISTRIBUTION," Congress provides: "After the adoption of a State legislature's concurrent resolution, funding to the State will be for distribution to local governments, councils of government, public entities, and public-private entities within the State either by formula or at the State's discretion."

Governor Sanford vetoed provisions of the Budget, including the ARRA funds. The General Assembly voted to override the vetoes on May 21, 2009.

Notwithstanding his § 1607(a) certification of the ARRA funds and the presence of a lawfully enacted appropriations act, Governor Sanford has refused to formally apply for the SFS funds. Governor Sanford's refusal to comply with state law is based on what he asserts as contrary and controlling federal law—a claim of absolute discretion under the ARRA, specifically § 14005. Although Governor Sanford removed these actions to federal court, the matters were remanded to this Court by order dated June 1, 2009.

## II.

### QUESTIONS PRESENTED

(1) Does the General Assembly have the authority under South Carolina law to require Governor Sanford to apply for the SFS funds?

(2) If so, are the provisions of the Budget requiring Governor Sanford to apply for the SFS funds in conflict with the ARRA?

(3) Should this Court grant a writ of mandamus to compel Governor Sanford to apply for the SFS funds?

(4) Does the Superintendent of Education have the authority to apply for the SFS funds in the Governor's name?

### III.

## SOUTH CAROLINA LAW

*Separation of Powers*

"In the government of this State, the legislative, executive, and judicial powers of the government shall be forever separate and distinct from each other, and no person or persons exercising the functions of one of said departments shall assume or discharge the duties of any other." S.C. CONST. art. I, § 8. One of the prime reasons for separation of powers is the desirability of spreading out the authority for the operation of the government to prevent the concentration of power in the hands of too few and provide a system of checks and balances. *State ex rel. McLeod v. McInnis,* 278 S.C. 307, 312, 295 S.E.2d 633, 636 (1982). Under our system, the legislative department makes the laws, the executive department carries the laws into effect, and the judicial department interprets and declares the laws. *Id.* at 312, 295 S.E.2d at 636.

The General Assembly has the duty and authority to appropriate money as necessary for the operation of the agencies of government and has the right to specify the conditions under which the appropriated monies shall be spent. *State ex rel. Condon v. Hodges,* 349 S.C. 232, 244, 562 S.E.2d 623, 631 (2002); *Gilstrap v. S.C. Budget and Control Bd.,* 310 S.C. 210, 216, 423 S.E.2d 101, 105 (1992) (noting that the appropriation of public funds is a legislative function); *Clarke v. S.C. Pub. Serv. Auth.,* 177 S.C. 427, 437, 181 S.E. 481, 484 (1935) (noting that the General Assembly has full authority to make appropriations as it deems wise in absence of any specific constitutional prohibition against the appropriation). This includes the duty to authorize and/or appropriate the use of all federal funds. S.C.Code Ann. § 11–11–160 (Supp.2008). In the annual appropriations act, the General Assembly must appropriate all anticipated federal funds and must include any conditions on the expenditure of those funds, consistent with federal laws and regulations. S.C.Code Ann. § 2–65–20 (2005). Money may be drawn from the treasury only pursuant to appropriations made by law. S.C. CONST. art. X, § 8. An appropriation may be made by the General Assembly in the annual appropriations act or in a permanent

continuing statute. *State v. Cooper*, 342 S.C. 389, 401, 536 S.E.2d 870, 877 (2000).

The Governor is charged with executing the law. S.C. CONST. art. IV, § 15 ("The Governor shall take care that the laws be faithfully executed."). One of the Governor's duties is to submit a recommended state budget to the General Assembly. S.C.Code Ann. § 11–11–15 (Supp.2008). The Governor has the ability, after the General Assembly has passed a budget, to veto items or sections contained within the budget. S.C. CONST. art. IV, § 21. However, if any item or section of the bill not approved by the Governor is overridden by two-thirds of each house of the General Assembly, it becomes a part of the law, notwithstanding the objections of the Governor. *Id.* "Once the legislature enacts a law, all that remains is the efficient enforcement and execution of that law." *Knotts v. S.C. Dep't of Natural Resources*, 348 S.C. 1, 7, 558 S.E.2d 511, 514 (2002). The administration of appropriations is a function of the executive department. *State ex rel. McLeod v. McInnis*, 278 S.C. at 314, 295 S.E.2d at 637. Executive agencies are required to comply with the General Assembly's enactment of a law until it has been otherwise declared invalid. *Layman v. State*, 376 S.C. 434, 450, 658 S.E.2d 320, 328 (2008).

Under the constitution and laws of this State, the General Assembly is the sole entity with the power to appropriate funds, including federal funds. Therefore, the General Assembly has the authority to mandate that the Governor apply for federal funds which it has appropriated. Because the General Assembly has overridden the Governor's vetoes of the provisions of the Budget concerning the SFS funds, those provisions are now law and must be executed by the Governor. Accordingly, under South Carolina law, Governor Sanford is obligated to take the actions required to apply for and accept the SFS funds.

## FEDERAL LAW

### *The ARRA*

The question then becomes whether our State law is in conflict with the ARRA. Where a statute is susceptible of

two constructions, one of which presents grave and doubtful constitutional questions, and the other of which avoids those questions, the Court's duty is to adopt the latter. *Jones v. United States,* 529 U.S. 848, 857, 120 S.Ct. 1904, 146 L.Ed.2d 902 (2000). "Federal legislation threatening to trench on the States' arrangements for conducting their own governments should be treated with great skepticism, and read in a way that preserves a State's chosen disposition of its own power, in the absence of the plain statement" in the language of the legislation of Congress' intent to alter the usual constitutional balance of state and federal powers. *Nixon v. Mo. Mun. League,* 541 U.S. 125, 140, 124 S.Ct. 1555, 158 L.Ed.2d 291 (2004); *Gregory v. Ashcroft,* 501 U.S. 452, 460–61, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991). In accordance with this rule of statutory construction, we must, if possible, construe the ARRA provisions to avoid any conflict between the ARRA and the General Assembly's mandate that the Governor apply for the SFS funds.

▪ The primary purpose in construing a statute is to ascertain legislative intent. *Gordon v. Phillips Utils., Inc.,* 362 S.C. 403, 406, 608 S.E.2d 425, 427 (2005); *Hodges v. Rainey,* 341 S.C. 79, 85, 533 S.E.2d 578, 581 (2000). In construing a statute, this Court must give effect to the will of Congress, and where its will has been expressed in reasonably plain terms, that language should be regarded as conclusive. *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 570, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982); *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980).

Section 1607 of the ARRA provides the methods for a state to certify that it will request ARRA funds and use the funds for the purposes set forth in the Act. Under § 1607(a), a certification must be made by the Governor that the State will accept funds provided for in the ARRA and use the funds for their intended purposes. Despite the fact that he expressed reservations about accepting the SFS funds, it is uncontested that Governor Sanford made the certification that the State desired the ARRA funds.

Petitioners in the Edwards Action argue § 1607(b) grants the General Assembly the authority to apply for SFS funds if

the Governor refuses to do so. In light of the Governor's § 1607(a) certification, we need not address the substantive contention in the Edwards Action that the General Assembly's mere compliance with § 1607(b) is sufficient to require SFS funding. We nevertheless construe § 1607(b), especially when read in conjunction with the distribution language of § 1607(c), as evidence of Congressional intent to allow a state legislature a meaningful voice in the decisional process. In short, Congressional intent as expressed in § 1607(b) and (c) defeats the Governor's contention that the ARRA unambiguously makes him the sole arbiter of whether South Carolina will accept the SFS funds. At best, when § 14005 is considered, we are confronted with a genuinely ambiguous statute. Here, the General Assembly, acting pursuant to § 1607(b) and (c), has expressed South Carolina's desire to receive the SFS Funds.

In § 14005(a), the ARRA provides, "[t]he Governor of a State desiring to receive an allocation under section 14001 shall submit an application...." Similarly, § 14005(c) provides "[t]he Governor of a State seeking a grant ... shall ... submit an application for consideration."

Governor Sanford argues that notwithstanding his § 1607(a) certification and the Budget, § 14005 grants him the sole discretion to determine whether to apply for the SFS funds. In this regard, Governor Sanford claims the ARRA, as a matter of federal law, trumps state law under the Supremacy Clause of the United States Constitution.[4] The Petitioners, the Attorney General, and Superintendent Rex argue for a construction of the ARRA that does not create a conflict with settled South Carolina separation of powers principles. Accordingly, they contend ARRA in general, and § 14005 in particular, does not grant to the Governor exclusive and unfettered discretion to accept or refuse the SFS funds, especially at this stage in the process following certification and the provisions of the Budget.

Governor Sanford is correct in that Congress may impose conditions on states receiving federal funds pursuant to its powers under the Spending Clause.[5] However, limits on

---

4. U.S. CONST art. VI, cl. 2.

5. U.S. CONST. art. I, § 8, cl. 1.

this power include the following: the conditions must be stated unambiguously, must bear some relationship to the purpose of the spending, and cannot require states to engage in unconstitutional activities. *South Dakota v. Dole*, 483 U.S. 203, 207–08, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987).

Congress clearly intended to provide funds to any state desiring to receive those funds. Sections 1607(b) and (c) evidence Congress' intent to include the legislatures of the states in that decision. However, there is no clear intent in the ARRA to give the Governor absolute discretion over whether to apply for funds as a condition of the State's receipt of the funds.

The ARRA contains no plain statement of Congress' intention to alter the unquestionable right of a state to constitutionally provide for the establishment and operation of its government. Further, the action of the General Assembly in requiring Governor Sanford to apply for the SFS funds in no way obstructs the purposes of the ARRA. To the contrary, the action of the General Assembly promotes the purposes of the ARRA.[6]

We accordingly construe the participial phrase "desiring to receive an allocation [or seeking a grant]" in § 14005 as modifying the word immediately preceding it——"State"——to avoid any conflict between our State constitutional allocation of power and the ARRA. With this construction, it is the State which must desire to receive the funds and grants, not merely the Governor. The Governor is the officer designated by Congress to perform the ministerial act of submitting the State's application for the funds.

---

6. The Governor's position in this matter is much like that of the state of South Dakota in *Lawrence County v. Lead–Deadwood Sch. Dist.*, 469 U.S. 256, 105 S.Ct. 695, 83 L.Ed.2d 635 (1985). The Governor wants to change the purpose for which Congress directed the ARRA funds to be used. To that end, he wrote President Obama and requested a waiver from the ARRA's spending purpose so that the SFS funds could be used for state debt reduction. The Office of Management and Budget denied this request on the grounds that such spending would violate the federal act. Similarly, in *Lawrence County*, the United States Supreme Court held that the state of South Dakota could not change the purpose for which federal payment in lieu of taxes funds could be utilized.

Under South Carolina law, the General Assembly has the sole authority to direct the appropriation of funds and, therefore, is the entity which decides whether the State desires to receive the funds. In its appropriation of the SFS funds in the Budget and its concurrent resolution, the General Assembly has acted on the Governor's § 1607(a) certification and expressed the State's desire to receive the funds. At this stage in the process, the Governor certainly has no discretion to make a contradictory decision on behalf of the State.

■ We hold the Governor must apply for the SFS funds.

## IV.

## REMEDY

The Petitioners in the Edwards Action seek a declaratory judgment that § 1607(b) of the ARRA allows the General Assembly to request, accept, and distribute the SFS funds, which the General Assembly included in the Budget, and that Governor Sanford must execute the Budget as enacted by the General Assembly. While we do agree and declare that Governor Sanford must comply with the Budget and promptly submit the ARRA "application" referenced in § 14005, we decline to do so as a function of § 1607(b) and (c).

■ SCASA requests this Court to issue a writ of mandamus to compel Governor Sanford to promptly submit the § 14005 "application" and take all legal and necessary steps to effectuate the State's receipt of the SFS funds for the purposes as set forth by Congress. We hold a writ of mandamus should issue against the Governor requiring him to follow the law.

■ The Supreme Court has the power to issue writs of mandamus. S.C. CONST. art. V, § 5; S.C.Code Ann. § 14–3–310 (1976). Mandamus is the highest judicial writ known to the law. *Brackenbrook N. Charleston, LP v. County of Charleston*, 360 S.C. 390, 400, 602 S.E.2d 39, 45 (2004). It is a coercive writ which orders a public official to perform a ministerial duty. *Wilson v. Preston*, 378 S.C. 348, 354, 662 S.E.2d 580, 582 (2008); *Ex Parte Littlefield*, 343 S.C. 212, 222, 540 S.E.2d 81, 86 (2000).

 For a writ of mandamus to issue, the following must be shown: (1) a duty of the Respondent to perform the act; (2) the ministerial nature of the act; (3) the Petitioner's specific legal right for which discharge of the duty is necessary; and (4) a lack of any other legal remedy. *Wilson v. Preston*, 378 S.C. at 354, 662 S.E.2d at 583. A ministerial act or duty is one which a person performs because of a legal mandate which is defined with such precision as to leave nothing to the exercise of discretion. *Id.* at 354, 662 S.E.2d at 583.

 A writ of mandamus may issue against a Governor for the performance of a purely ministerial act. *Blalock v. Johnston*, 180 S.C. 40, 44, 185 S.E. 51, 52 (1936) ("[W]hen, in the exercise of some official power neither political nor essentially governmental, the law specially enjoins upon the Governor of the state as a duty the performance of some particular act, under circumstances in which he has no discretion, and his refusal to perform the act deprives a party of his property or of some legal right, mandamus will lie against the Governor to compel the performance of such ministerial act, in the absence of other plain, speedy, or adequate remedy at law."). *See also Fowler v. Beasley*, 322 S.C. 463, 467, 472 S.E.2d 630, 633 (1996) (noting the Supreme Court has jurisdiction to review the ministerial acts of the Governor); *Easler v. Maybank*, 191 S.C. 511, 511, 5 S.E.2d 288, 289 (1939) (noting that the Governor of South Carolina is subject to a writ of mandamus to compel the performance of a purely ministerial duty).

The duty to execute the Budget, as properly enacted by the General Assembly, is a ministerial duty of the Governor. He has no discretion concerning the appropriation of funds. The application for the SFS funds is a simple, definite duty arising under the conditions specified in the ARRA and leaves nothing to Governor Sanford's discretion. It is a ministerial duty. Because the General Assembly, following Governor Sanford's certification and request that the ARRA "funds be released," included the SFS funds in the Budget and by virtue of its concurrent resolution, the clear intent is the State of South Carolina desires the SFS funds, and Governor Sanford must ask for the funds.

While we recognize and respect Governor Sanford's sincerely held beliefs concerning the ARRA, those convictions do not alter the ministerial nature of the legal duty now before him. The decision on a request to mandamus the Governor is an extremely delicate one, which is undertaken with great reluctance and consciousness of its great gravity and importance. *Blalock v. Johnston,* 180 S.C. at 43, 185 S.E. at 52. However, when mandamus is warranted, "the judiciary cannot properly shrink from its duty." *Id.* at 50, 185 S.E. at 55.

We hold under the circumstances presented that a writ of mandamus is warranted and issue a writ of mandamus to compel Governor Sanford to apply for the SFS funds and take all legal and necessary steps to effectuate the State's receipt of the SFS funds for the purposes as set forth by Congress.

Because we hold Governor Sanford is required to apply for the SFS funds and issue a writ of mandamus ordering him to do so, the Court need not reach the question of whether the Superintendent of Education may apply for the funds on behalf of the Governor.

## V.

## CONCLUSION

Our decision today should not be construed as a comment on the policy differences between Governor Sanford and the General Assembly respecting the wisdom or necessity of South Carolina accepting the SFS funds. Under our limited role, the matter is presented to us as one of statutory construction of the ARRA and the application of settled state separation of powers principles. We discharge our duty to honor the rule of law, nothing more.

We issue a writ of mandamus compelling the Governor of South Carolina to comply with the law as set forth above.

PLEICONES, J., concurring in a separate opinion.

Justice PLEICONES, Concurring:

As explained below, I would hold that the petitioners in *Edwards v. State* are entitled to the declaratory relief that they seek, and therefore would not reach the merits of the issues raised in the *South Carolina Association of School*

*Administrators* case. I do so because I believe that the *Edwards* case can be resolved without reaching the constitutional issues necessarily involved in the *School* litigation.

Petitioners Edwards and Williams (petitioners) seek a declaration that respondent Sanford (the Governor) must perform the actions required by the American Recovery and Reinvestment Act of 2009 (ARRA)[7] to apply for the State Fiscal Stabilization (SFS) Funds available under that Act. I would grant the requested relief.

In enacting the ARRA, Congress, exercising its authority pursuant to the spending clause,[8] provided two methods by which a state could express its desire to receive ARRA funds. Section 1607 of the ARRA is entitled "ADDITIONAL FUNDING DISTRIBUTION AND ASSURANCE OF APPROPRIATE USE OF FUNDS." Under § 1607(a), entitled "CERTIFICATION BY GOVERNOR," the ARRA provides "for funds provided to any State or agency thereof, the Governor of the State shall certify that: (1) the State will request and use funds provided by this Act. . . ." In § 1607(b), entitled "ACCEPTANCE BY STATE LEGISLATURE," the act provides "If funds provided . . . in any division of this Act are not accepted for use by the Governor, then acceptance by the State legislature, by means of the adoption of a concurrent resolution, shall be sufficient to provide funding to such State." As the legislative history makes clear, § 1607(b) was included in the ARRA in response to suggestions from the Governor that he was averse to accepting federal funds.

Under my reading of the ARRA, either a certification or a concurrent resolution is required in order for ARRA funds to be received by a state. Section 1607 vests the decision to exercise discretion first in the Governor, and then, as to any funds which he chooses not to accept, discretion vests in the General Assembly.

The Governor did provide a timely letter[9] expressing his intent to accept ARRA funds, and his desire that the letter

---

7. Pub. L. 111–5 (Feb. 17, 2009).

8. U.S. Const. art. I, § 8, cl. 1.

9. Letter from the Governor to the Director of The Office of Management and Budget dated April 3, 2009.

serve as his § 1607(a) certification. In this certification letter, however, the Governor stated that he was not applying for the SFS Funds, and expressed his "reservations about accepting these funds."

In response to the Governor's letter indicating that he was certifying but not accepting SFS Funds, the General Assembly exercised the discretion afforded it by § 1607(b) and enacted a concurrent resolution accepting the SFS Funds. Although the Governor argues that such a resolution does not have the force of law in this State, he misapprehends the purpose for which this resolution was passed: to exercise the discretion given the General Assembly under federal law to accept funds which the Governor had declined.

Here, we have a certification from the Governor under § 1607(a) which declines to accept the SFS Funds, followed by a concurrent resolution under § 1607(b) by which the General Assembly exercised its discretionary power to accept the SFS Funds.

The ARRA further requires that in order to receive SFS Funds, "the Governor of a State **desiring** to receive an allocation [of these funds] shall submit an application ...." § 14005 (emphasis supplied). While there is some debate as to the proper grammatical construction of this statutory phrase, I conclude that § 14005 was drafted to accommodate the two methods, certification or concurrent resolution, by which a state can demonstrate that it desires SFS Funds. South Carolina has manifested its desire for SFS Funds through the concurrent resolution method provided for in § 1607(b). Once a state has expressed its desire to receive SFS funds through § 1607, it is my view that the state's governor is obligated to obtain those funds by complying with the requirements in § 14005.

If a state expresses its desire to receive ARRA funds through a concurrent resolution, § 1607(c) of the ARRA then requires that "funding to the State will be for distribution to local governments, councils of government, public entities, and public-private entities within the State either by formula or at the State's discretion." Here, through the adoption of the annual appropriations act, the General Assembly has provided for the distribution of the SFS Funds and thus has met the mandate of § 1607(c). In short, South Carolina has fulfilled

all the requirements set forth in federal law to demonstrate that it desires SFS Funds.

The Governor contends that the appropriations act offends the South Carolina Constitution's separation of powers clause[10] to the extent it purports to compel him to apply for the SFS Funds. As explained above, I read § 1607 to give the governor of a state or, under certain circumstances, its legislature, the authority to determine whether a state desires ARRA funds. Under my view of the ARRA, the Governor's obligation to complete the SFS Funds application process found in § 14005 arises from the General Assembly's compliance with the provisions of § 1607(b) and (c), and is not based upon the appropriations act itself. The appropriations act is relevant to my analysis only to the extent that it fulfills the requirement of § 1607(c). I perceive no separation of powers issue here.

Petitioners request the Court issue a declaratory judgment that, the General Assembly having fulfilled the requirements of § 1607(b) and (c), the Governor and the executive branch must perform any and all acts necessary for the State to receive SFS Funds from the federal government. I would grant this relief.